IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JO ANN PERCY, ADMINISTRATRIX OF THE ESTATE
OF JEFFREY JEROME LEGGETTE, DECEASED          PLAINTIFF

VERSUS          CIVIL ACTION NO. 3:09CV687 WHB-LRA

HINDS COUNTY, MISSISSIPPI; MALCOLM E.
McMILLIN, SHERIFF OF HINDS COUNTY,
MISSISSIPPI; ROBERT GRAHAM, DOUGLAS ANDERSON,
PEGGY HOBSON CALHOUN, PHIL FISHER AND GEORGE
SMITH, IN THEIR OFFICIAL CAPACITIES AS MEMBERS
OF THE HINDS COUNTY BOARD OF SUPERVISORS OF
HINDS COUNTY, MISSISSIPPI; JOHN DOES, DETENTION
CENTER ADMINISTRATORS, 1 - 5; AND RICHARD ROES,
DETENTION CENTER OFFICER 1 - 5          DEFENDANTS

DEPOSITION OF MALCOLM McMILLIN

APPEARANCES:
    ELLIS TURNAGE, ESQUIRE
    Law Office of Ellis Turnage
    108 North Pearman Avenue
    Cleveland, Mississippi  38732

    REPRESENTING THE PLAINTIFF

    J. LAWSON HESTER, ESQUIRE
    Wyatt Tarrant & Combs
    4450 Old Canton Road, Suite 210
    Jackson, Mississippi  39211
    REPRESENTING THE DEFENDANTS

Taken at the instance of the Plaintiff
In the Law Offices of Wyatt Tarrant & Combs
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
On August 26, 2010, at 2:02 p.m.

---

Page 2

1          TABLE OF CONTENTS
2    Examination by Mr. Turnage          6
3    Examination by Mr. Hester          132
4    Further Examination by Mr. Turnage          162
5    Further Examination by Mr. Hester          164
6    Further Examination by Mr. Turnage          165
7      Exhibit 1 (Correctional Facility Diagram)          43
8      Exhibit 2 (Procedures for Special Needs Patients)  134
9      Exhibit 3 (Procedures for Inmate Death)          135
10     Exhibit 4 (Training for Correctional Officers)  137
11     Exhibit 5 (Procedure for Psychotropic Medication) 141
12     Exhibit 6 (Procedure for Monitoring Medications)  141
13     Exhibit 7 (Procedure for Receiving Screening)     143
14     Exhibit 8 (Intake Booking for Health Screening)   144
15     Exhibit 9 (Suicide Prevention Screening)          146
16     Exhibit 10 (Procedure for Mental Health Evaluation) 147
17     Exhibit 11 (Procedure for Emergency Services)     149
18     Exhibit 12 (Procedure for Mental Health Services) 150
19     Exhibit 13 (Procedure for Suicide Prevention)     152
20     Exhibit 14 (Suicide Prevention Program)          157
21     Exhibit 15 (Medical Refusal Form)          159
22     Exhibit 16 (Hinds County Detention Progress Notes) 160
23     Exhibit 17 (Order of Committment)          165
24   Deposition Concluded          167
25   Certificate of Court Reporter          168

---

Page 3

1          MR. HESTER:  This deposition is being
2    taken pursuant to the Federal Rules of Civil
3    Procedure, reserving all objections except as to
4    the form of the question or the responsiveness of
5    the answer, and we will read and sign.
6          MR. TURNAGE:  Before we get started, y'all
7    had -- in your answers to interrogatories, there
8    was some additional documents that y'all say that
9    was going to be made available to us.
10         Specifically, for the record, these -- the
11   County's answer -- responses to plaintiff's first
12   set of interrogatories were filed on June the
13   15th of 2010, and --
14         MR. HESTER:  What documents are you
15   requesting?
16         MR. TURNAGE:  Specifically to
17   Interrogatory No. 11 about recorded statements,
18   and there were a bunch of people's names who was
19   listed in Interrogatory No. 11.
20         The answer was "Copies of the above-detailed
21   items are in the possession of Hinds County and
22   all -- it's Hinds County Department -- all
23   communication with the county employees relating
24   to this must go through the undersigned.  These
25   15 statements that are" --

---

Page 4

1          MR. HESTER:  Do you mind if I look at
2    yours --
3          MR. TURNAGE:  No.
4          MR. HESTER:  -- because I don't have that
5    with me.  While I review this, I mean, this is
6    the sheriff -- the deposition of Malcolm
7    McMillin, and the entire position is limited to
8    qualified immunity issues, anyway, but let me
9    review what you've mentioned.
10         (Reviews document)  Well, the interrogatory
11   you're referencing is Interrogatory No. 11, which
12   asks if we're aware of any statements, and the
13   response is yes.
14         MR. TURNAGE:  But you haven't produced
15   them.  They weren't produced in the initial
16   disclosures, and they were not produced in
17   response to the interrogatories or the request
18   for production of documents.
19         So what I'm doing today is I'm trying to
20   confer with you in good faith to see if you're
21   going to give them to me or do I need to file a
22   motion to compel and ask the court to give them
23   to me.
24         MR. HESTER:  Well, as of right now, the
25   deposition is -- the discovery is limited to the

EXHIBIT 8

1    issues of qualified immunity.
2         MR. TURNAGE: Well, no. I disagree with
3    you on that now, Lawson.
4         MR. HESTER: That's fine.
5         MR. TURNAGE: You filed the motion, but
6    the judge hasn't ruled on that; so, now, this
7    deposition was noticed before you filed that.
8         MR. HESTER: Rule 16.1(b)4-b says that the
9    filing of an immunity motion stays all discovery
10   except that related to the issue of qualified
11   immunity. So that's my position.
12        MR. TURNAGE: Well, but your motion don't
13   supersede the court order that has already been
14   entered. Now, if you're going to take that
15   position and you're going --
16        MR. HESTER: The filing of the motion
17   stays discovery except that related to the issue
18   of qualified immunity.
19        Look, let's make it real simple. If you
20   want to depose the sheriff today, you can. I
21   don't have any other documents to give you today.
22   You're bringing this up at the start of a
23   deposition. You haven't mentioned it to me
24   before today. If you want to depose him, depose
25   him. If you don't, we'll go home. Your call.

1         MR. TURNAGE: Well, okay, I got my point
2    on record. You got your points on the record.
3         MR. HESTER: Okay.
4         MR. TURNAGE: For the record, this motion
5    that we're talking about was filed -- motion to
6    stay, Document No. 77, was filed on yesterday.
7         MR. HESTER: Yeah.
8         MR. TURNAGE: The notice of deposition had
9    been pending in this case for -- I don't know how
10   long, but for a good while. It's of record, so
11   it won't be any problem about that.
12             * * * * * *
13        MALCOLM E. McMILLIN,
14   having first been duly sworn, was examined and
15   testified as follows:
16             EXAMINATION
17   BY MR. TURNAGE:
18        Q.   All right, Sheriff, tell me your full name.
19        A.   Malcolm Edward McMillin.
20        Q.   Sheriff McMillin, my name is Ellis Turnage,
21   and I am legal counsel for the estate of Jeffery Jerome
22   Leggett, who is now deceased. We previously took your
23   testimony deposition in another case on Chaney v. Hinds
24   County back on June the 29th of 2010, so I'm not going
25   to go over a lot of the -- your educational background

1    and that stuff.
2         I mean, you agree that the information you
3    provided in the Andre Chaney deposition was truthful
4    information and is still true and correct.
5         A.   I do.
6         Q.   Okay. We're here about the suicide death,
7    the hanging suicide death, of Jeffery Jerome Leggett.
8    Do you remember that incident?
9         A.   No, I can't say I remember that incident. I
10   know what you're talking about.
11        Q.   Well, at some point in time I think the --
12   his death was on June the 14th of 2007, according to
13   the documents.
14        MR. HESTER: If you know, Sheriff. If you
15   know.
16        A.   Well --
17   BY MR. TURNAGE:
18        Q.   Have you reviewed the incident reports
19   related to his death?
20        A.   I have reviewed the incident reports related
21   to his death since the time of the occurrence. Now, as
22   to when that was or how long ago it was and what I
23   remember about it, I can't tell you.
24        I know that there was a suicide in the jail
25   and Mr. Leggett was the -- was the deceased, and I have

1    no reason to doubt -- if you tell me that that was the
2    date that it occurred on, I have no problem with that.
3         Q.   Well, what I want to hand you to show you
4    that I'm not trying to trick you or anything --
5         A.   I don't think you're trying to trick me at
6    all.
7         Q.   These were documents here that was filed in
8    the case against Hinds County and yourself that was
9    filed by your attorney on the 25th day of March of
10   2010.
11        A.   Is that a question?
12        Q.   Well, do you see that?
13        A.   No, I don't see it from there; but if you
14   turn it around where I can look at it, I'll be glad --
15        Q.   Okay.
16        A.   -- to look at it.
17        Q.   All right.
18        A.   Submitted the 25th day of March, 2010.
19        Q.   And this is a document that we're referring
20   to as --
21        A.   "Prediscovery disclosure of Defendants
22   Hinds County, Mississippi; Robert Graham; Doug
23   Anderson, Peggy Hobson Calhoun, Phil Fisher; George
24   Smith; members of the Hinds County Board of Supervisors
25   in their official capacities; and Hinds County Sheriff

1 Malcolm McMillin in his official capacity."
2    Q. And you would agree with me that attached to
3 this document are certain documents that have numbers
4 starting with PKH-1 going through 16. Right?
5    A. The first document is PKH-1 -- 01 through
6 PKH-016.
7    Q. Okay. And you recognize these documents, at
8 least several of them, as being incident reports.
9 Right?
10    A. I would say that what you have in front of
11 you are incident reports.
12    Q. From your Hinds County Detention Facility at
13 Raymond. Right?
14    A. No question about it. Well, I -- that's what
15 it says on the top of the page.
16    Q. Are you saying that's not your form?
17    A. No, I'm not saying -- I'm not questioning
18 whether or not it is. You -- there it is. That's what
19 it is. That's fine with me.
20    Q. Okay. And all I'm asking you is that
21 according to this document that you agree that it
22 pertains to Jeffrey Leggett.
23    A. The Jeffrey Leggett's name is at the top of
24 that, along with Lieutenant Stanley Thurmond, who
25 apparently made the report.

1    Q. And you agree that this -- according to this
2 document, that it was on June the 14th -- is there
3 any -- even though it's cut off over here, do you agree
4 that that's the date, June 14th, 2007?
5    A. I wouldn't disagree with it.
6    Q. All right. You recognize Lieutenant
7 Stanley Thurmond?
8    A. I recognize the name, yes.
9    Q. All right. You don't know him personally?
10    A. I have 500 employees. I don't know all of
11 them personally.
12    Q. Okay, I see. Okay. According to this,
13 you're familiar with Area B-4, 5125.
14    A. I'm familiar with B-4.
15    Q. And what about Cell 5125?
16    A. Well, you know, I would be as familiar with
17 that as I am every other cell that's out there, because
18 they are all alike except one is, you know, capacity of
19 one, and the other has capacity of two; and then there
20 are isolation cells. So, yes, am I familiar with 5125?
21 As familiar with it as I am any cell in the jail.
22    Q. Okay. So you can't tell me the date of
23 Jeffery Jerome Leggett's death. You don't know that?
24 Let me show you his official death certificate.
25    A. (Reviews documents)

1    MR. HESTER: You want him to read it?
2    MR. TURNAGE: Well, I'm just trying to
3 refresh his memory to get some of the basic
4 operative facts.
5 BY MR. TURNAGE:
6    Q. I presume that you didn't review any of this
7 before you came to your deposition.
8    A. I came here to review -- I've reviewed the
9 facts in this case. I have reviewed the information
10 before. As to when I did that, you know, that's --
11 that's another matter. I mean, I'm not disputing
12 anything you say here.
13    Q. Well, all right. Well, listen at my
14 question. Can we agree that his death certificate says
15 he died on June the 14th, 2007?
16    A. Show me the date on it.
17    MR. HESTER: Let me show you. The
18 document in the upper right-hand --
19    A. June 14th of 2007. Date of death: Month,
20 day, and year. June 14, 2007.
21    MR. HESTER: It was Box 3-B of the death
22 certificate which is being read by the sheriff.
23 BY MR. TURNAGE:
24    Q. I will show you the official autopsy report
25 that has been given concerning the Jeffrey Jerome

1 Leggett death.
2    A. If you'll help me here try to understand
3 this -- and I know that's what you want me to do is
4 understand what you're asking -- are -- am I to assume
5 that he's not dead?
6    Q. No. I'm simply asking --
7    A. That he's -- but, I mean, that's -- that's
8 what I'm asking. You're asking me he's dead.
9    Q. All right.
10    A. Right? So I've got a copy of his death
11 certificate. We have a copy of his autopsy.
12    Q. What date --
13    A. I agree he's dead.
14    Q. What day does his autopsy say he died on?
15    MR. HESTER: Take your time. Look at the
16 document, Sheriff.
17    A. Okay. (Reviews documents) Date and time of
18 autopsy is June the 15th, 2007, at 1925 hours.
19 BY MR. TURNAGE:
20    Q. Okay. That was the day of the autopsy.
21    A. It says here "Time and date of autopsy: June
22 15th, 2007, at 1925 hours."
23    Q. Okay. Let me see it back.
24    A. (Tenders document)
25    Q. Do you know Dr. Steven Hayne?

1     A.   No.
2        Q.   You don't know him?
3     A.   No. We've never had the pleasure.
4        Q.   Of meeting? Okay.
5     A.   Well, I mean, you -- may be a pleasure, maybe
6  not. I just hadn't met him.
7        Q.   You agree that the autopsy report says that
8  the cause of death was ligature hanging?
9     A.   I can say that the cause of death according
10  to that report says ligature hanging.
11        Q.   And the manner of death was suicide. Right?
12     A.   And the manner of death was suicide.
13        Q.   Okay.
14     A.   Well, wait a minute. I don't think that's
15  what it says. I think it says "Underlying cause of
16  death: Manner of death, suicide."
17        Q.   Okay. Well, there's nothing --
18     A.   Because you didn't highlight it, I don't read
19  it.
20        Q.   Okay. All right.
21           MR. HESTER: Sheriff, just for the record,
22        could you clarify what you're reading from?
23     A.   This is the final report of autopsy on
24  Mr. Jeffrey Leggett.
25

1  BY MR. TURNAGE:
2        Q.   And what was the number of the autopsy?
3     A.   Is that the AME report?
4        Q.   Yes.
5     A.   That's 6-H5-07.
6        Q.   Okay. All right. And according to the
7  documents PKH-1 through -- I want you to just briefly
8  take a moment and read these statements and refresh --
9           MR. HESTER: Every one of them?
10           MR. TURNAGE: Well, it's only -- it's
11        pages --
12     A.   It's 16 of them.
13           MR. TURNAGE: Actually, it's pages 1 --
14        yeah, you can read all of them. Just briefly
15        read through them. I'm going to make this an
16        exhibit to the record.
17           MR. HESTER: Okay. All I'm asking you is
18        to clarify. You want him to read the handwritten
19        statements that are on pages 1 through 6.
20           MR. TURNAGE: The handwritten statements.
21        1 through 6, yeah.
22           MR. HESTER: Okay.
23           MR. TURNAGE: The handwritten statements.
24           MR. HESTER: He's asking you to read PKH-1
25        through PKH-6. Take your time and read those

1     statements, Sheriff.
2     A.   On the above date and --
3           MR. HESTER: Not out loud, to yourself.
4     A.   (Reviews documents)
5           MR. HESTER: Finished?
6           THE WITNESS: Yes.
7           MR. HESTER: Okay. He's finished reading,
8        Ellis.
9  BY MR. TURNAGE:
10        Q.   Okay. You reviewed it?
11     A.   I reviewed it.
12        Q.   Did it refresh your memory?
13     A.   Yes.
14        Q.   You had obviously read those reports before?
15     A.   I had read those reports before.
16        Q.   Okay. And you agree with me that according
17  to those reports that Mr. Leggett hanged himself in the
18  Hinds County Detention Center according to those
19  reports.
20     A.   I agree.
21        Q.   Where were you when you found out about this?
22     A.   I was at home in bed, I think. If I weren't,
23  I should have been.
24        Q.   I think the -- according to those reports, he
25  hanged himself around -- or he was found around 1925.

1     A.   Um-hum. (Affirmative)
2        Q.   Which would be 7:25 in the evening?
3     A.   I go to bed early.
4        Q.   Okay. That's fine. You would agree with me
5  that according to the statements --
6     A.   Well, let me -- let me back up with that
7  since we're -- since we want to be technical,
8  apparently, about it.
9        I wasn't on duty at the jail at the time. I
10  was off. So I may be at home and sit in my recliner
11  with my feet propped up. I might have been in bed. I
12  might have been outside working on my motorcycle. I
13  might have been cutting the grass. But I wasn't on
14  duty at the jail at the time.
15        Q.   Okay. All right. Did you personally know
16  Jeffrey Jerome Leggett?
17     A.   Not to my knowledge, no.
18        Q.   Did you ever meet him?
19     A.   Not to my knowledge.
20        Q.   Okay. That's good.
21     A.   Well, I mean, I hope so. I can't do anything
22  about it, if it isn't. You know, I don't know him.
23        Q.   All right. Now, other than -- what
24  agencies -- what law enforcement agencies or entities
25  came in and investigated Jeffrey Jerome Leggett's

1  death?
2     A. The coroner's office, Hinds County Sheriff's
3  Office, staff at the jail.
4     Q. So the Hinds County Coroner in 2007 would
5  have been who?
6     A. Sharon Grisham Stewart.
7     Q. And you say that the Hinds County Sheriff's
8  Department. Is that right?
9     A. Right.
10     Q. That's the Internal Affairs office?
11     A. Could be.
12     Q. You signed these interrogatory answers here
13  for Hinds County back on the 15th of June of 2000.
14  Right? That's your signature right there?
15     A. Don't mind if I look, now.
16     Q. Okay.
17     A. Okay. (Reviews document) So that appears to
18  be my signature.
19     Q. Okay.
20     MR. HESTER: Hang on. Before you give
21     them back --
22  BY MR. TURNAGE:
23     Q. On page 11 of Defendant Hinds County's
24  responses to plaintiff's first set of interrogatories,
25  that's your signature. Right?

1     A. Tell me what you're referring to. Show me
2  what you're talking about.
3     Q. Page 11 of Defendant Hinds County's --
4     A. Is that not just what you showed me --
5     Q. Yes, sir.
6     A. -- and asked me if that was my signature?
7     Q. Yes.
8     A. And did I say yes?
9     Q. Okay.
10     A. Well, I mean, it's no reason for me to change
11  my mind if that's the same one that you showed me
12  before, is it?
13     Q. All right. I just wanted to make sure.
14     A. All right. Well, no, you don't want to make
15  sure. You -- in my opinion, what you're trying to do
16  is aggravate me -- and doing a pretty good job of it --
17  but we'll see how it goes before it's over with.
18     Q. All right. Well, you would agree that the
19  documents that you signed saying that -- under oath --
20  it was under oath before a notary public saying that
21  you personally appeared and that the information
22  contained in there was true and that you had firsthand
23  knowledge of it.
24     According to this answer here on page 6, it
25  says that the Internal Affairs investigation and report

1  and recommendation to the Hinds County Sheriff's
2  Department Internal Affairs Division. Right?
3     MR. HESTER: Object to the form of the
4  question. You mischaracterized his
5  acknowledgment, Counsel. I don't know if you
6  meant to do that or not, but the acknowledgment
7  specifically says to the contrary, that they are
8  not necessarily made upon firsthand personal
9  knowledge, but upon information provided by
10  others. That's page 12 of the interrogatory
11  answers.
12     So if you want to make that clear, I ask you
13  to clarify your question utilizing the correct
14  paraphrase or the exact wording of the
15  acknowledgment rather than saying they are made
16  directly and firsthand personal knowledge.
17     MR. TURNAGE: Well --
18     MR. HESTER: Or we can simply attach a
19  copy of the acknowledgment so it will speak for
20  itself. It doesn't matter to me.
21     MR. TURNAGE: So you're saying that the
22  rules don't require that it be --
23     MR. HESTER: No. I'm saying you
24  mischaracterized what the acknowledgment said.
25     MR. TURNAGE: Okay. Well, the

1  acknowledgment will speak for itself. So if you
2  as an officer of the court have come up with some
3  acknowledgment that don't comply with the rules,
4  we'll take that up at a later date.
5  BY MR. TURNAGE:
6     Q. But my whole point of it is -- and the only
7  thing I'm trying to ask you is -- according to your
8  answer here, that the -- the only somebody that you say
9  that investigated here was the Hinds County Sheriff's
10  Department Internal Affairs Division. Right?
11     A. I didn't say not only the Internal Affairs
12  Division, but I said staff at the jail as well.
13     Q. Okay. Well, when you mean the staff at the
14  jail, you're referring to the officer's statement who
15  you just read?
16     A. Which officer's statement was it that I just
17  read?
18     Q. Those six that I gave you, PKH-1 through 6.
19     A. Well, now, that's not that officer, but those
20  officers. Right. So we're talking about those six
21  that I just read.
22     So their statements are part of that
23  investigation as well, are they not.
24     Q. Well, I haven't seen -- these are the only
25  ones --

1    A.   Well --
2    Q.   -- I've seen so far.
3    A.   Well, I mean, but you've seen those. I mean,
4    they are, are they not?
5    Q.   All right. But listen to my question,
6    Sheriff.
7    A.   I'm trying to.
8    Q.   But listen to me. Hear me out one more time.
9    A.   Okay.
10   Q.   Other than the Hinds County Sheriff's
11   Department Internal Affairs Division, did any other
12   entity or agency investigate the death of Jeffery
13   Jerome Leggett?
14       MR. HESTER: Object as asked and answered.
15   He's already told you about one other entity.
16   A.   Hinds County Coroner's office.
17   BY MR. TURNAGE:
18   Q.   Okay. And the Hinds County Sheriff's
19   Department Internal Affairs Division.
20   A.   Correct.
21   Q.   All right. Anybody else investigate it? Any
22   other agency or entity came in to investigate it that
23   you're aware of?
24   A.   Not that I'm aware of.
25   Q.   All right. Well, you certainly are the --

1    who made the decision -- who made the decision as to
2    which agencies would investigate Jeffery Jerome
3    Leggett's death?
4    A.   I did.
5    Q.   Why didn't you bring in the, say, the state
6    highway safety patrol or the FBI?
7    A.   I believe that statutorily that the coroner
8    has that authority to investigate, does she not? She's
9    not a part of the Hinds County Sheriff's Department.
10   Q.   Okay. Did you ever consult with her about
11   bringing someone else in?
12   A.   No. She never consulted with me either.
13   Q.   Okay.
14   A.   So, I mean, she -- apparently, she found that
15   there was no need to -- that what she saw was pretty
16   evident, and, consequently, she didn't see the need to
17   bring anybody else in.
18   Q.   So it's your testimony that --
19   A.   She has that authority as well. I mean, she
20   could call, ask for the highway patrol investigator, or
21   ask for help from outside.
22   Q.   But you told me previously that you made the
23   decision that the Hinds County Sheriff's Department
24   Internal Affairs would conduct the investigation.
25   Right?

1    A.   I mean, the final authority is with me, yes.
2    Q.   Okay. And so tell me where her authority
3    begins and ends from what you understand.
4    A.   With -- I think it might be with the
5    constitution.
6    Q.   But I'm saying, I mean, can she overrule your
7    decision or not?
8        MR. HESTER: Object to the form of the
9    question.
10   BY MR. TURNAGE:
11   Q.   "She" being Sharon, the county coroner.
12       MR. HESTER: That's not my objection. My
13   objection is to the form of the question, unless
14   you clarify what you're asking she can or cannot
15   overrule.
16   BY MR. TURNAGE:
17   Q.   Well, let me ask you this question this way.
18       MR. TURNAGE: I'll withdraw that question.
19   BY MR. TURNAGE:
20   Q.   Was the Hinds County Sheriff's Department
21   Internal Affairs investigation, was it separate and
22   apart from the Hinds County Coroner's investigation?
23   A.   They were both -- I would say they were
24   working together.
25   Q.   They were working together.

1    A.   Yeah.
2    Q.   Okay. All right. And there would be --
3    A.   So, I mean, she does have the -- when you ask
4    about the authority, I mean, she determines that cause
5    of death, doesn't she?
6    Q.   I don't know.
7    A.   And have the authority. Well, I mean, that
8    would -- I'm just the sheriff; I'm not the lawyer.
9    Q.   Okay. Well, the statute will speak for
10   itself. You're saying that --
11   A.   If the statute would speak for itself, then
12   the coroner can determine the cause of death.
13   Q.   Okay. And you agree with me that no state or
14   federal agencies were contacted to investigate Jeffery
15   Jerome Leggett's death.
16   A.   No. No, wait. Let me rephrase. I agree
17   with you.
18   Q.   Okay. Who appointed Captain Bobby Funchess
19   and Investigator Sharon Kyle to conduct the
20   investigation into Jeffery Jerome Leggett?
21   A.   I informed them as Internal Affairs
22   investigators, and they were called.
23   Q.   By you or by whom?
24   A.   By the jail the night that that happened.
25   Q.   Is there a written jail policy that

1  determines how an inmate's death -- whether or not the
2  Hinds County Sheriff's Department Internal Affairs will
3  investigate an inmate death at a Hinds County jail
4  facility?
5      A.  I hate to keep you waiting, Counselor, but --
6      Q.  Well, I would -- which document do you refer
7  to?  The page numbers?
8      A.  You want to give me a chance to read it and
9  then refer to the page numbers?
10     Q.  Yes, sir.
11     A.  Okay.  Thank you.
12         Page 1 of 2 documents, and it's entitled
13  "Health Services Policies and Procedures Manual.
14  Procedure in the event of an inmate death.  Subject:
15  Procedure in the inmate -- with an inmate death.
16  Ensure accurate, timely reporting and investigation of
17  any inmate death that occurs within this institution.
18  In the event of an inmate death, proper notification
19  and review are performed.
20         "Procedures:  One, medical director, health
21  services administrator, and designated institutional
22  staff will be immediately notified of all inmate
23  deaths.
24         "Two, all inmate deaths will be reported to
25  the medical examiner by the institutional authority or

1  examiner will then be notified by sheriff or his
2  designee.  The medical director will provide critical
3  debriefing sessions as soon after the inmate death as
4  possible."
5      That's the policy.
6      Q.  And --
7      MR. HESTER:  That's my copy.  You have
8  one.  It was produced on June 15th.
9      MR. TURNAGE:  And for the record, what you
10  were reading from is Bates-stamped HC-116 and
11  HC-117.
12     MR. HESTER:  His copy is not, no; yours
13  is.
14  BY MR. TURNAGE:
15     Q.  This is the procedure in the event of an
16  inmate death.  Right?  Is that yes or no?
17     A.  Well, show me what you're -- what you're
18  looking at, because I can't see it from this side.
19     (Reviews documents) "Health services policy
20  and procedures manual."  That's what it is.
21     Q.  And number --
22     A.  Procedure in the event of an inmate death.
23  And that would be --
24     MR. HESTER:  He's referring to down here
25  in the bottom.

1  designee.  A postmortem examination will be requested
2  and required by state law.
3      "Three, if the death was (or was or suspected
4  to be) a suicide, a postmortem psychological profile
5  will be completed if requested by the institutional
6  authority or the medical director.
7      "Four, a death review will be conducted in
8  accordance with policy and procedure morbidity and
9  mortality reviewed.
10     "Five, following an inmate suicide death, a
11  critical incident debriefing for correctional and
12  health service staff will be offered.  Separate inmate
13  debriefing will be offered for inmates affected by the
14  death.
15     "Six, immediately after healthcare staff that
16  were present at the time of death has completed
17  documentation or after the hospital has then notified
18  site staff of inmate death, one copy of the medical
19  record will be made.  Copy will be secured in the
20  health services unit with access to the medical
21  director and administrator or designee.
22     "Seven, appropriate staff will be proactively
23  identified to provide all critical incident debriefing.
24  And the following procedure:  The medical director will
25  be notified in the event of an inmate death.  Medical

1      A.  HC-00116.
2      MR. HESTER:  And.
3      A.  HC-00117.
4  BY MR. TURNAGE:
5      Q.  Okay.  Now, we've agreed that the date of --
6  that he died was on June the 14th of 2007.  Right?
7      A.  We did.
8      Q.  Now, on that date, who was the medical
9  director?  This is the medical -- this refers to the
10  medical director of the Hinds County Detention Center
11  at Raymond or for all three jail facilities in Hinds
12  County?
13     A.  Well, that would be the same person.
14     Q.  All right.  The three jail facilities in
15  Hinds County are the detention center at Raymond --
16     A.  Correct.
17     Q.  -- the detention center downtown --
18     A.  Correct.
19     Q.  -- and then you told me the state-county work
20  center.
21     A.  At that time.  That's what we'll have to
22  check on and see as to whether or not it was at that
23  particular time.
24     Q.  Or it could have been just the --
25     A.  Could have been just the county farm.

1    Q.   -- county farm.
2         And so, now, back on 4/27 -- no, excuse me --
3    June 14th, '07, who was the medical director that
4    you're referring to?
5    A.   I will have to look and see who it was for
6    the record.
7    Q.   Who is the medical director now?
8    A.   I just hired him yesterday, so --
9    Q.   Okay.  Does he have a name?
10   A.   He does have a name, and if I could recall
11   it, I would tell you what it is now.
12   Q.   Okay.  Well, at some point Dr. Carl Reddix
13   was the medical director?
14   A.   No.
15   Q.   He was the physician there?
16   A.   He was physician, yes.
17   Q.   Is Dr. Carl Reddix, is he still a physician
18   at the --
19   A.   I think he is.
20   Q.   Okay.  And the health services administrator
21   on June 14th, '07?
22   A.   Again, we'll have to refer to the record to
23   see who it was at the time.
24   Q.   Okay.  And the medical examiner -- which
25   medical examiner does this refer to?

1    A.   Which -- which document are you referring to?
2    Q.   On page -- this procedure in the event of an
3    inmate's death here where it says --
4    A.   That would be the head of the medical program
5    -- the department of -- medical department for the
6    jail.
7         MR. HESTER:  I think what he's asking you
8    is are you referring to the state medical
9    examiner or are you referring to --
10   A.   Not referring to the state medical examiner.
11   Not referring to Dr. Reddix, but referring to that
12   director of inmate medical care hired by the jail.
13   BY MR. TURNAGE:
14   Q.   Well, if you're saying that it refers to the
15   medical director, why doesn't it say medical director?
16   Did you write this policy?
17   A.   I signed it.  Now --
18   Q.   Who wrote it?
19   A.   -- whether I wrote it or not, I couldn't tell
20   you whether I wrote it or not.
21   Q.   Okay.  But you agree that No. 2 refers to the
22   medical examiner.  Right?
23         MR. HESTER:  Let me give him the policy
24   back so he can look at it.
25   A.   "All inmate deaths will be reported to the

1    medical examiner by the institutional authority or
2    designee."
3         So our nurse or our medical in charge would
4    be responsible for reporting to the -- to the coroner,
5    who would in turn report to that medical examiner that
6    you're talking about -- would be the state medical
7    examiner.
8    BY MR. TURNAGE:
9    Q.   Okay.  And you agree that under your policy,
10   institutional authority refers to the sheriff or his
11   designee.  Right?
12   A.   I would say, yeah, sheriff or his designee.
13   Yes.
14   Q.   Okay.  Some of this policy is cut off on the
15   side over here.  You agree with that.  Right?  Or does
16   your copy have it cut off?
17   A.   Mine's cut off too.  I don't think they did
18   that to you on purpose.  I believe that, you know, it
19   all happened the same way.
20   Q.   And I understand that you're not a lawyer,
21   but from your knowledge and information -- you've been
22   sheriff since 1992.
23   A.   That's right.
24   Q.   Is there a -- you know what a state statute
25   is.  Right?  And the state code?

1    A.   I do.
2    Q.   Is there a state code in Mississippi that
3    says that the sheriff's got to report a death in his
4    jail to the state medical examiner's office?
5    A.   It does.
6    Q.   Okay.  And to anybody else that it requires
7    that you report it to?  Every year you have to report
8    it to the United States Attorney General also.  Right?
9    A.   I do.
10   Q.   There's a form that you report it.
11   A.   I do.
12   Q.   Okay.  All right.  Where are those forms kept
13   at?
14   A.   In the files.
15   Q.   At your office?
16   A.   I don't -- I don't -- I don't keep files.
17   Q.   What do you call that form?
18   A.   I don't call it anything.
19   Q.   What's the name of the form?
20   A.   I couldn't tell you what the name of the form
21   is.
22   Q.   But you agree that under state law as sheriff
23   you have --
24   A.   I agree that under state law, if there's an
25   inmate death within my jail, I have the obligation and

1   law -- I'm -- a statute requiring me to report that,
2   not only to the state but to the feds as well.
3       Now, do you have any knowledge of me not
4   doing that?
5     Q.   No, sir.
6     A.   Well, I mean, if I haven't done it, tell me
7   about it, because I've done it every time there's been
8   one.
9     Q.   All right.  But listen at what I'm asking,
10  though, Sheriff.
11    A.   I'm listening, and that's part of the
12  problem.
13    Q.   All I'm trying to do is -- tell me where I
14  can get the forms from.  What's the name of them? so I
15  can request a copy of them.
16    A.   Okay.
17       MR. HESTER: Asked and answered.  He said
18  he didn't know the name of the form.
19  BY MR. TURNAGE:
20    Q.   But is there some person in your office that
21  handles the filing of them and keeping up with them?
22    A.   We'll see that you get a copy of that form.
23    Q.   Is there some person in your office that
24  handles that duty and responsibility for you?
25    A.   I'm certain it is, because I don't do it

1   myself.
2     Q.   Well, who is that person?
3    A.   I would say Alma Heard would be responsible
4   for determining who would be responsible for putting
5   the -- putting the form in the file and putting it in
6   the proper filing place.
7    Q.   And what is Alma's job title?
8    A.   She's administrative assistant to the
9   sheriff.
10    Q.   And where is her office located?
11    A.   Right outside mine.
12    Q.   And your office, you told me, is on
13  Pascagoula Street.  Right?
14    A.   That's right.
15    Q.   What's the physical street, the physical --
16    A.   Well, it's actually not on Pascagoula Street.
17  It's right behind the courthouse, which is on
18  Pascagoula Street.
19    Q.   What address y'all use?
20    A.   Tombigbee.
21       MS. AINSWORTH: 407 East Pascagoula.
22    A.   407 -- 407 East Pascagoula.
23  BY MR. TURNAGE:
24    Q.   Okay.
25       MR. HESTER: When you mentioned Alma, I

1    don't know if your question, Ellis, was as of
2    today or when you were talking about, but Alma --
3
4  BY MR. TURNAGE:
5    Q.   How long has Alma been with you?
6       MR. TURNAGE: That's fair to point out.
7    A.   Yeah.  About a year now, I guess.
8  BY MR. TURNAGE:
9    Q.   Who was the person before her?
10    A.   Steve Pickett.
11    Q.   Steve Pickett.  He's still with you, isn't
12  he?
13    A.   He is.
14    Q.   What's his position now?
15    A.   He is chief deputy.
16    Q.   And chief deputy is defined in some of these
17  documents here.  Where does he fit in the chain of
18  command as chief deputy?
19    A.   Three.
20    Q.   He's number three?
21    A.   Um-hum. (Affirmative)
22    Q.   Undersheriff will be number two?
23    A.   Yeah.
24    Q.   Who is the undersheriff?
25    A.   Eddie Swinney.

1    Q.   Steve Pickett or Puckett?
2    A.   Pickett.
3    Q.   Pickett, P-I-C-K-E-T-T?
4    A.   Um-hum. (Affirmative)
5    Q.   Okay.  All right.  And at some point you told
6  me that you would have received a copy of the six
7  incident reports that was filed by the on-duty jailers
8  on June the 14th of '07, pages 1 through 6 there that
9  you just read.
10    A.   I would have either received copies of them
11  or been briefed by Internal Affairs, who would have
12  copies of those statements.
13    Q.   And at some point you would have received a
14  copy, the final report?
15    A.   Or it would have been -- it would have been
16  explained to me.  It was gone over with me by Internal
17  Affairs.
18    Q.   Now, the jail officials, the high-ranking
19  jail officials -- let's see.  Sheriff, undersheriff,
20  the chief deputy; and then under that is who?  Major --
21    A.   Bobby Funchess now.
22    Q.   What is Bobby Funchess's position?
23    A.   He's captain of patrol now.  I mean -- excuse
24  me -- major in charge of patrol division.
25    Q.   And who would be under Major Bobby Funchess?

1    MR. HESTER: We are talking now. Right?
2    MR. TURNAGE: Right.
3    A. Captain Steve Bailey.
4    BY MR. TURNAGE:
5    Q.  And where does Major Rushing fit in?
6    A. Jail commander.
7    Q.  She would come under the captain?
8    A. No. She was -- she's a major in charge of
9    the jail. She would come under Chief Swinney.
10   Q.  I thought you said the chief deputy was
11   third.
12   A. Chief deputy is third. Swinney, Colonel
13   Swinney, is -- we call him captain, chief, sheriff,
14   undersheriff.
15   Q.  That's now as of today.
16   A. Yeah.
17   Q.  All right. Now, let's go back to -- let's do
18   the same thing back on June the 14th of 2007. You were
19   sheriff.
20   A. Yeah.
21   Q.  Who was undersheriff?
22   A. Eddie Swinney.
23   MR. HESTER: Do you mind if I show him
24   this?
25   MR. TURNAGE: No. Be happy to.

1    MR. HESTER: It's several of those pages,
2    Sheriff, if you want to look at that. It's been
3    a while.
4    THE WITNESS: It has.
5    MR. TURNAGE: Which number?
6    MR. HESTER: They are not numbered. They
7    are the documents -- they are within the
8    documents that were produced to you that would be
9    found -- yeah -- starting with that and several
10   pages back.
11   MR. TURNAGE: How far does it go?
12   MR. HESTER: Until it gets to the list of
13   policies.
14   MR. TURNAGE: Okay. So we're talking about
15   Numbers 88 through 97?
16   MR. HESTER: We are.
17   MR. TURNAGE: Okay. HC-88 through 97.
18   MR. HESTER: His aren't numbered, but
19   that's what he has in front of him, yes.
20   MR. TURNAGE: Okay. All right.
21   BY MR. TURNAGE:
22   Q.  And so let's see here. This is October, so
23   88 through 97 would have been the people that were in
24   place on June the 14th of 2007.
25   A. June the 14th of 2007. Let me find it. You

1    have to forgive me. I'm taking almost as long as you.
2    Q.  That's okay. I mean --
3    A. All right. (Reviews documents) I believe
4    2006 is as far as we're going here with this.
5    Q.  So it would be fair to assume that as of --
6    shown on October the 19th, that that would have been
7    the same people that would have been in place on June
8    the 14th of '07?
9    A. Well, no, because there have been some
10   changes.
11   Q.  Well, as of now, but I'm talking about in
12   '07, that was the closest --
13   A. Well, I mean, they didn't just start changing
14   now. I mean, it's been a changing process over 20
15   years, but we can go from -- October 19th of 2006, I
16   think, is the latest one that we have.
17   So we have myself as sheriff; undersheriff,
18   Swinney; Ruth Wyatt, director of medical services;
19   under Chief Swinney, Major Rushing; and under Major
20   Rushing, Captain Cooley.
21   Q.  Okay. So, really, what you're telling me,
22   then, as of today, you can't say whether on June the
23   14th the people were there on October the 19th or not.
24   A. I'm saying that staffing at the Hinds County
25   Sheriff's jail and sheriff's department is in a state

1    of flux and is in a constant state of flux. People
2    retire; people move to other positions; they are
3    transferred. So exactly who was in what position at
4    the time would take -- take a lot of research to find
5    out exactly who was there.
6    Q.  Okay. That's fine.
7    A. And I don't have that in front of me.
8    Q.  That's fair. Okay.
9    According to the information that we have
10   reviewed already, at the time of Jeffery Leggett's
11   suicide death, that was at 1925. That would be during
12   the second shift.
13   A. That's correct.
14   Q.  Right?
15   A. That's correct.
16   Q.  And then on each shift you have a lieutenant,
17   a sergeant, and a corporal. And according to this,
18   there were three deputies: Larry Davis, Michael
19   McWilliams, and Jerry Durham, according to those
20   documents.
21   A. Which documents are you referring to?
22   Q.  Pages 1 through 6, PKH-1 through 6. 1 is for
23   Lieutenant Thurmond.
24   A. Right. Lieutenant Thurmond.
25   Q.  And then page 2 and 3 is for --

1    A.   -- Shannon Brumfield.
2    Q.   -- Sergeant Shannon Brumfield.  Right?
3    A.   Yeah.  And --
4    Q.   That's Shannon Brumfield as well.  Hers is
5  two pages.
6    A.   And Larry Davis.
7    Q.   Larry Davis.  And who is the next one?  Larry
8  Davis was a deputy?
9    A.   Um-hum.  (Affirmative)
10    Q.   And then you've got Corporal Quinton Powell?
11    A.   That's right.
12    Q.   And then the next one, page 5, is who?
13    A.   Jerry Durham.
14    Q.   Jerry Durham.
15    A.   Um-hum.  (Affirmative)
16    Q.   And then I think the final one, page 16, is
17  Michael McWilliams.
18    A.   Williams.
19    Q.   I don't think you read Michael McWilliams
20  before, did you?  You only went through 6.
21    A.   I just did what you asked me to.
22    Q.   All right.  I agree.  Read Michael Williams'
23  statement for me on page 16.
24    A.   (Reviews documents)
25        MR. HESTER:  You want him to read the

1    other one while he's at it?
2        MR. TURNAGE:  Those are medical people.
3    A.   Okay.
4  BY MR. TURNAGE:
5    Q.   From reading that statement, I mean, do you
6  agree with me that Michael McWilliams was the jailer
7  over the B-4, Cell 5125 on -- at the time of the
8  hanging --
9    A.   No.
10    Q.   -- of Jeffery --
11    A.   I would -- I wouldn't necessarily agree with
12  you on that.  I would say that he's the one that
13  noticed the cry for help from -- from the cell mate of
14  Jeffery Leggett who's saying that he needed medical
15  help and discovered him hanging.
16    Q.   All right.  So over this -- let's see.  I
17  think I brought my copy of the layout of the jail.  I
18  think I did.
19        All right.  B -- each pod has four sections.
20  Right?
21    A.   That's correct.
22    Q.   So each section -- on each shift, how many
23  jailers would be on duty for each section?  This would
24  be Section B-4.  How many jailers would be on duty?
25    A.   In the ideal situation, we would have one --

1  one officer in every -- in every living area, meaning
2  that pod.  Excuse me.  Not that pod, but that --
3    Q.   -- that section of the pod.
4    A.   -- that section of the pod.
5    Q.   Each pod has four sections.
6    A.   That's right.  And there would be one in
7  each, and then one in pod control who would have
8  control of the -- of the -- of ingress and egress to
9  the living areas themselves.
10    Q.   When you say "the ideal situation," what do
11  you mean by that?
12    A.   Yeah.  Well, I mean if -- if everybody was --
13  everybody was on duty that day and nobody had to -- had
14  to miss work, nobody got sick and went home.
15        MR. TURNAGE:  Let's mark this Exhibit 1
16    to Sheriff McMillin's deposition.
17        (EXHIBIT 1 MARKED)
18  BY MR. TURNAGE:
19    Q.   Are you familiar with Exhibit 1?
20    A.   I think I am, yeah.
21    Q.   Do you agree that that is an accurate diagram
22  and layout of the ground floor at the Hinds County
23  Detention Center at Raymond?
24    A.   Yeah.
25    Q.   Is there a drawing that would show the upper

1  level?
2    A.   Well, I mean, I don't know if it would be any
3  different other than to see the stairs there.  I mean,
4  it's the same thing up and down.
5    Q.   So it would be the exact same layout upstairs
6  or down.
7    A.   If you're looking at it there, you see the
8  same thing.
9    Q.   Okay.  So we can assume, based on your
10  testimony, then, that -- let's see.  Does each of the
11  pods have upstairs areas?
12    A.   Yes.
13    Q.   Each one.  So all three pods, A --
14    A.   Yeah.
15    Q.   -- B, and C have an upstairs.
16    A.   Yes.
17    Q.   And you say it's laid out exactly --
18    A.   Yes.
19    Q.   It's stacked above the ground --
20    A.   That's correct.
21    Q.   -- the first level.
22    A.   That's correct.
23    Q.   Okay.  And you would have one jailer in each
24  living area and one pod control --
25    A.   That's correct.

1    Q.  -- for each --
2    A.  That's correct.
3    Q.  Where would the pod control officer be
4  sitting?
5    A.  In the center here.
6    Q.  And when you say "the center," I'm going to
7  put a red circle around it.
8    A.  Yeah, you can -- yeah, that will work.
9    Q.  And each one of the jailers in the living
10  area would be in the area that I have highlighted 1, 2,
11  3, and 4?
12    A.  That's correct.
13    Q.  So that would be for the -- so it would be
14  fair under your testimony to say that on June the 14th
15  of 2007 --
16    A.  Um-hum. (Affirmative)
17    Q.  -- Pod B, the four sections there, would have
18  had five officers --
19    A.  Under ideal conditions, with the -- you know,
20  with everybody staffed, nobody calling in sick, nobody
21  gone to sick call, that's the way it would be.
22    Q.  Okay.  And would that be the same staffing
23  for Pod A, B, and C?
24    A.  They -- under ideal -- you know, under ideal
25  conditions with nobody having called in sick, no

1  problems, that's the way it would be staffed.
2    Q.  So how many people would be on each shift,
3  then?
4    A.  Well, I'm not going to -- when you say "on
5  each shift," what -- you mean each shift at the jail or
6  each shift in the pod, each shift in the housing unit?
7  Tell me what you mean by that.
8    Q.  Each -- when I say "each shift," we got three
9  shifts -- first shift, second shift, and third shift.
10  Right?
11    A.  Right.
12    Q.  In the housing pod.
13    A.  Now -- so, now, what you're referring to is
14  in the housing unit itself.
15    Q.  The housing unit itself.
16    A.  One person in the housing unit.
17    Q.  And when you're -- what you're calling a
18  housing unit is Section 1, 2 --
19    A.  Where the inmates --
20    Q.  -- 3, and 4?
21    A.  Is where the inmates live.
22    Q.  Right.  Okay.  And each one would have a --
23  one control deputy.
24    A.  What you've got your finger on now we would
25  refer to as pods, so if that clarification is -- that's

1  a pod.
2    Q.  That's what you call the pod control officer.
3    A.  No.  We call the pod control officer in here
4  who controls the doors to all of these.  All right?
5    Q.  This is Pod C according to the diagram.
6    A.  Yeah.
7    Q.  This is Pod A.
8    A.  Yeah.
9    Q.  Okay.  And you're saying that Pod C would
10  have a pod control officer that I've circled in red.
11    A.  Yeah.
12    Q.  And so would Pod A, which would be where?
13    A.  Same place.  The same place in the -- in
14  perspective to the --
15    Q.  But show me where you would say it would be.
16    A.  (Indicating)
17    Q.  Right.
18    A.  Same way -- same place you drew the other red
19  circle.
20    Q.  All right.  Okay.  Now, back on June the
21  14th, we know that Jeffery Leggett was housed in B-1.
22    A.  If that's what we went over before, that's
23  what it was.
24    Q.  Or B-4.
25    A.  See, it's got you confused, doesn't it?

1    Q.  B-4, 5125.
2    A.  All right.
3    Q.  All of it says B-4, 5125.  Can you show me on
4  here where you would say that 5125 is?
5    A.  No.
6    Q.  If you can?
7    A.  No.
8    Q.  But it would have to be in one of these cells
9  over here in B-1.  Right?
10    MR. HESTER:  Object to the form of the
11  question.  You said B-4.
12  BY MR. TURNAGE:
13    Q.  B-4.  I'm sorry.  B-4.  It would have to be
14  one of the ones in B-4.
15    A.  Okay.
16    Q.  How many cells is in B-4?  Estimate.
17  Roughly.
18    A.  How many cells in B-4?  It would either be --
19  well, 33 cells and 5 isolation cells that are off to
20  the side.
21    Q.  And that would be on the first level?
22    A.  No.  It would be first and -- that's
23  everything.
24    Q.  That's total.
25    A.  That's everything.  That's total.

1    Q.   So you're saying it's 33 and 5.  That would
2  be 38 totals cells?
3    A.  That's correct.
4    Q.   So that would be 19 down and 19 upstairs?
5    A.  That's correct.
6    Q.   Okay.  And you agree with me that the jailer
7  that's in, say, the B-4 section, B-4 living area --
8    A.  Um-hum.  (Affirmative)
9    Q.    -- his job duties are to monitor and
10  supervise the inmates in that section of the jail?
11    A.  Well, unless 3 has to go to the bathroom.
12  Then he would go and relieve him.  And if 4 had to go
13  to the bathroom, 3 would go and relieve him.
14    Q.   So if 3 relieves 4 or 4 relieves 3, who's
15  supervising and monitoring -- if 3 relieves 4 --
16    A.  Yeah.
17    Q.    -- who's monitoring 3?
18    A.  Well, at the time, he would be both of them.
19    Q.   He would be monitoring 3 and 4.
20    A.  Yeah.
21    Q.   Upstairs and downstairs.
22    A.  Yeah.
23    Q.   Okay.  How often does that happen?
24    A.  I couldn't tell you.
25    Q.   Okay.  If we wanted to know on any specific

1  day, we would have to look at the jail logs, the jail
2  logbooks?
3    A.  That's correct.
4    Q.   And the staffing roster for that particular
5  day?
6    A.  Right.  And they may not -- you know, they
7  may not write down bathroom breaks.
8    Q.   Okay.  Okay.  And you're saying -- would it
9  be fair to say that on June the 14th, 2007, that
10  Section B-4 housed involuntarily committed mental
11  patients?
12      MR. HESTER:  Object to the form.
13  BY MR. TURNAGE:
14    Q.   Jeffery Leggett was what we call an
15  involuntarily committed mental patient.  Judge Pat Wise
16  or one of the chancery judges had signed an order on
17  him.  Right?
18      MR. HESTER:  Object to the form unless you
19    clarify the time.
20    A.  I would -- I think has to make clear that I
21  may be aware of something now that I was not aware of
22  at the time.
23  BY MR. TURNAGE:
24    Q.   Tell me what that is.  That's fair.
25    A.  As to whether or not he was an involuntarily

1  committed mental patient.
2    Q.   Okay.  You're aware now that he was.
3    A.  I'm aware now that he was.
4    Q.   And when did you become aware?
5    A.  At the particular point in time, I couldn't
6  tell you.
7    Q.   Well, why do you say that makes a difference?
8    A.  Well, I think we have a responsibility to
9  deal with those involuntarily committed mental patients
10  in a different way than we would a general population
11  inmate.
12    Q.   Mr. Hester has given you a copy of the Hinds
13  County Chancery Court Order on Jeffery Leggett.
14    A.  That's correct.
15    Q.   And it's Bates-stamped HC-1 and HC-2.
16      MR. HESTER:  Yours is; his isn't.
17      MR. TURNAGE:  Mine isn't.  Okay.
18  BY MR. TURNAGE:
19    Q.   You see a copy -- you have a copy of it
20  there.  Right?
21    A.  Yes.
22    Q.   And who signed that order?  I thought --
23      MR. HESTER:  Three signatures, same as
24    yours.
25

1  BY MR. TURNAGE:
2    Q.   Well, Patricia Wise was the chancellor, but I
3  think that --
4    A.  Bobby Houston was the special master.
5    Q.   Yeah.  R.L. Houston, special master, yeah.
6      And you agree that this order provided that
7  he was to be held for his protection and the protection
8  of others.
9    A.  That's correct.
10    Q.   And in the Hinds County Jail.  That's the
11  same thing as the --
12      Well, let's back up for one second.  He came
13  in on January the 10th.  Right?
14      MR. HESTER:  If you know, Sheriff.
15  BY MR. TURNAGE:
16    Q.   You do -- your jail do create documents on
17  people when they come into your jail?  Right?  It's
18  what you call a booking document?
19      MR. HESTER:  Objection.  It's the Hinds
20    County Jail.  Object to the form of the question.
21    He doesn't own it personally.
22    A.  If I did, I would sell it to you.
23  BY MR. TURNAGE:
24    Q.   You agree with me --
25      THE WITNESS:  Can we -- can I be excused

1    for --
2        MR. HESTER: You need a break?
3        MR. TURNAGE: Sure.
4        (OFF THE RECORD)
5    BY MR. TURNAGE:
6        Q.   Okay.  We was back to the -- we was back to
7    Judge -- to the court order.
8        A.   Right.
9        Q.   We are talking about it.  The court order
10   placed Mr. Leggett in your custody.
11       A.   Correct.
12       Q.   And the court order advised you that or
13   states that --
14       MR. HESTER: Actually, Ellis, would you
15       correct that form of the question?  It placed him
16       in the custody of the Hinds County Jail according
17       to the wording of the order.  You said his
18       custody.  I don't think you meant Sheriff
19       McMillin personally.
20   BY MR. TURNAGE:
21       Q.   Well, but as the sheriff, you're responsible
22   for the jail.  Right?
23       MR. HESTER: Object to the form of the
24       question.
25

1    BY MR. TURNAGE:
2        Q.   19-25-71.  You're familiar with your state
3    law duties as sheriff.  Right?
4        A.   I am.
5        Q.   And doesn't it say that you are the -- what
6    -- read --
7        A.   Well, I didn't question that.
8        Q.   Oh, okay.  Okay.
9        A.   Yeah.
10       Q.   But according to that statute, what does the
11   statute say?
12       A.   I'm responsible for the jail.
13       Q.   In fact, it specifically says the sheriff
14   shall be the jailer of his county.
15       A.   That's right.
16       Q.   Okay.  And in the performance of his duties
17   as jailer, he shall employ a jailer or jailers to have
18   charge of prisoners in the jail.
19       A.   Right.
20       Q.   Okay.  And you acknowledge that state law
21   duty.
22       A.   Right.
23       Q.   Okay.
24       MR. HESTER: For the record, that's not
25       the whole statute.

1        THE WITNESS: Yeah.
2        MR. HESTER: You read part of it.
3    BY MR. TURNAGE:
4        Q.   That's the part we're talking about.  Right?
5        A.   Well, I mean, that's the part you're talking
6    about.  I don't have any question about that.  This is
7    -- it says -- the order says it "be ordered and
8    adjudged that the respondent, Mr. Leggett, be committed
9    to the state hospital for observation, diagnosis, and
10   treatment, Hinds County Jail for holding until bed
11   becomes available at state hospital, and that it is the
12   -- that's the least restrictive appropriate facility
13   for holding for his protection and the protection of
14   others."
15       Q.   And it found him to be in need of mental care
16   and treatment.
17       A.   It did.
18       Q.   Okay.  All right.  And you see these orders
19   all the time, don't you?
20       A.   I do.
21       Q.   How many mental patients you see?
22       A.   You don't even want to think about them.
23       Q.   In the run of a year, how many would you say
24   if you had to guess?  Your best estimate.
25       A.   Oh, I --

1        MR. HESTER: Don't guess, Sheriff.  If you
2        know, tell him.
3        A.   Yeah.  Well, I --
4    BY MR. TURNAGE:
5        Q.   Well, let me ask you this:  What would be
6    your best estimate for a month?  How many mental
7    patients you get orders for?
8        MR. HESTER: Again, you're under oath, so
9        don't guess.  If you know, answer him.  If you
10       don't, tell him you don't know.
11       A.   I think I'm going to listen to counsel on
12   that.
13   BY MR. TURNAGE:
14       Q.   But tell me your best estimate.
15       MR. HESTER: Don't guess, again.
16       MR. TURNAGE: Okay.
17       MR. HESTER: If you know, you can tell
18       him.
19   BY MR. TURNAGE:
20       Q.   Well, let me ask you this:  Do you get a copy
21   of each order?
22       A.   No.
23       Q.   How does -- once these orders are entered and
24   filed -- this one was filed on June the 13th of 2007.
25       A.   Correct.

1    Q.   -- your people transport these -- transported
2  Mr. Leggett from --
3    A.   Did, and transported him that day and
4  transported him back to the jail.
5    Q.   All right.  So when did y'all get a copy of
6  the order? is what I'm asking.
7         MR. HESTER:  Object to the form of the
8    question.  Can you clarify what you mean by
9    "y'all"?
10 BY MR. TURNAGE:
11   Q.   Your department.  The Hinds County Sheriff's
12 Department.  When would they have received a copy of
13 this court order on Jeffery Leggett?
14   A.   When the judge -- when the special master
15 issued that order and the signatures were affixed to
16 it, they were given a copy of that, along with the --
17 along with the patient, and he was transported back to
18 the jail.
19   Q.   How could I find out who the transportation
20 officer was on June the 14th of '07?
21   A.   We'll have to check and see who was working
22 that particular detail on that day.
23   Q.   Okay.  Under your policy and procedure, once
24 the order was entered and it was given to the transport
25 deputy by the chancery court officials --

1    A.   Right.
2    Q.   -- what was that officer to do with it?
3    A.   Take him to -- take him to booking and give a
4  copy of that order to the booking officer.
5    Q.   And the booking officer would have been whom?
6    A.   Again, we'd have to check the file to see who
7  was there at the time.
8    Q.   Okay.  Who is the booking officer now?  Do
9  you know?
10   A.   No.
11   Q.   Okay.  And, now, Mr. Leggett, according to
12 the documents that I have been provided, I think he was
13 arrested and brought to the jail initially on -- it
14 says his photo would be on June 11th.  I think he was
15 actually arrested on the late night of the 10th, and by
16 the time he got booked in the jail, it was over to the
17 11th.  That's what I'm thinking.
18   A.   Um-hum.  (Affirmative)
19   Q.   Because it says at 2 a.m. in the morning.  Is
20 that right?
21   A.   Well, I'll have to look to see if it's right,
22 but I wouldn't dispute that, now.
23        MR. HESTER:  If you will, if you refer to
24   something, refer to the document, for clarity, in
25   the corner -- the number.

1    A.   All right.  HC-00003.  And this was the photo
2  date 6/11 of '07, and he was booked in on 6/10, so
3  there was that time.
4  BY MR. TURNAGE:
5    Q.   Now, walk me through the booking process.
6    A.   All right.  Now, tell me what you mean by
7  the booking -- booking process.
8    Q.   Whatever --
9    A.   What is it you want to know? and I'll tell
10 you.
11   Q.   Okay.
12   A.   Otherwise, we can fence around all afternoon.
13 If you -- you're talking about when you bring a
14 prisoner in and you have charge on him, you bring him
15 in with a field arrest report.  That's given to the
16 booking officer.  The escort officer puts him in a
17 holding tank or cell, and he's called out -- you know,
18 first-in/first-out.  And then he comes up and gives his
19 information to the officer who's in booking, who writes
20 down all the pertinent information, and then sends him
21 back to that holding tank.  Then he's brought out to go
22 for his fingerprints and photo.
23   Q.   All right.  You would agree with me that
24 looking at pages 10, HC-10 --
25        MR. HESTER:  He doesn't have those in

1  front of him.
2         MR. TURNAGE:  I'm going to give -- I'm
3  going to.
4  BY MR. TURNAGE:
5    Q.   -- 11, 12, 13 -- 10 through 13 -- and I'll
6  turn them around and let you look at them.  All of them
7  say that they came in on the 10th of June.
8    A.   Okay.
9    Q.   And it looks like from those documents that
10 he was actually taken to the penal farm at Raymond
11 initially.
12   A.   (Reviews documents)  All right.  Now, what was
13 the question again?
14   Q.   Would you agree with me that it looked like
15 that he was taken to the --
16   A.   There's reference there to the penal farm.
17 As to whether or not he was taken there or whether or
18 not he was classified at the jail and -- to be sent to
19 the penal farm --
20   Q.   Okay.
21   A.   -- would be the question.
22   Q.   Okay.  And pages 3 and 4, does it identify
23 what jail location he's being held at on the 11th?
24        MR. HESTER:  Three and 4?
25

1 BY MR. TURNAGE:
2     Q.    Three and 4.
3     A.    (Reviews documents) I don't see it.
4     Q.    Okay.  Now, on --
5     A.    With a -- well, I'm sorry.  I didn't mean to
6 interrupt you.
7     Q.    That's all right.  On page 6, at the top
8 here, it says at the Hinds County Detention Center
9 Raymond preclassification.
10     A.    Right.
11     Q.    And that's at 2:01 a.m.
12     A.    Um-hum.  (Affirmative) Is that a question?
13     Q.    But this on page 6 -- I mean, what is this
14 form used for?
15     A.    To make a determination as to where to send
16 somebody.
17     Q.    Okay.
18     A.    Based on their -- you know, if they have --
19 if they are a master electrician, then we can find a
20 place to put them if they are doing time with us.  If
21 they are landscapers, if they are bricklayers, any
22 special needs, if there were -- if he was a paraplegic,
23 then wouldn't be any need to send him to the penal
24 farm, because that's where we work.
25     Q.    I get you.

1         And then you look on page 8 here.  We have a
2 cover letter from Eddie Jean Carr, who is the chancery
3 clerk.  This here is at 6/11, so now we are up to 11:38
4 a.m.  Right?
5     A.    Okay.
6     Q.    And it says to -- what does that say? --
7 Barlow, booking?
8     A.    Yeah.
9     Q.    Who is Barlow?
10     A.    Barlow was the booking officer.
11     Q.    What's his first name?  If you know.
12         MR. HESTER:  Shelby.
13     A.    Shelby Barlow.
14 BY MR. TURNAGE:
15     Q.    And it says that it's from the Hinds
16 County --
17     A.    Well, let me -- let me go back a minute.
18     Q.    Okay.
19     A.    Barlow is not the only person that's been
20 named Barlow that's worked for me.  I have 500
21 employees.  I don't know them all personally.  I don't
22 know the name with the face a lot.  So you're going to
23 have to help me on that when you want to ask me that
24 question, because it makes it sound like when I say "I
25 don't know," "I don't know" makes it sound like I don't

1 know.
2     Q.    Okay.
3     A.    So be clear when you ask me a question, and I
4 can respond to it.
5     Q.    All right.  On June 11th at 11:38 a.m.,
6 according to HC-8, we know that the Hinds County
7 Chancery Court faxed this to the detention center
8 booking section --
9     A.    Okay.
10     Q.    -- telling them that hold for a hearing on --
11     A.    Right.
12     Q.    -- Wednesday, June the 13th.  And so what you
13 told me earlier was that on the 13th, an officer -- so
14 we know that the jail -- that the Hinds County
15 Detention Center at Raymond knew that this guy was a
16 mental patient at least on June the 11th at 11:30.
17         MR. HESTER:  Object to the form of that
18     question.  That's an unfair characterization of
19     the document and his prior testimony.
20 BY MR. TURNAGE:
21     Q.    Well, what do you say that that document
22 says?
23     A.    It's a transmittal cover sheet to Barlow,
24 Shelby Barlow, in booking from the -- Roz at the Hinds
25 County Chancery Court referencing Jeffery Jerome

1 Leggett.  Number of pages that this cover sheet covers
2 is three, and it says hold for hearing 6/13 of '07.
3     Q.    So obviously somebody at the jail knew what
4 this was about.
5         MR. HESTER:  Object to the form.
6     A.    It says "hold for hearing," and it was
7 addressed to Barlow.
8 BY MR. TURNAGE:
9     Q.    Okay.  And so we know that Mr. Leggett did
10 have a hearing on June the 13th.
11     A.    Well, what we -- what we know is that
12 Mr. Barlow was notified of that hearing and to hold --
13 to hold him until 6/13 of '07.
14     Q.    Okay.
15     A.    That Roz sent that message, so we know that
16 Barlow got it.
17     Q.    And where do you see "Roz" on there at?
18     A.    (Indicating) There.
19     Q.    Roz who?
20     A.    She works --
21     Q.    Is that Morris?
22     A.    I don't know if she's Morris or not.  Roz is
23 all I know.  And she handles mental patients.
24     Q.    Okay.  All right.  All right.  Now, we know
25 that the judge has signed the order --

1    A.  Um-hum. (Affirmative)
2    Q.    -- on June the 13th after the hearing.
3    A.  Right.
4    Q.    And that you say that the transport officer
5  would have brought a copy back to booking.
6    A.  (Nods affirmatively)
7    Q.    How does it get from the booking people to
8  the section where he's going to be housed?
9    A.  Well, I mean, booking is where it's going to
10  be determined where he's going to be housed. That's
11  where the housing officer is.
12    Q.    All right. So then under these documents the
13  booking section of the jail made to put him in B-4.
14    A.  Apparently, yes.
15    Q.    Now, when a -- during the booking process, I
16  saw what they had -- a form in here that asked some
17  questions. This was on June 11th at 2:01 a.m., and
18  this is your suicide prevention screen.
19    A.  Um-hum. (Affirmative)
20    Q.    Is that right? Does every inmate come
21  through the jail under your policy and procedure have
22  to undergo a suicide prevention screen?
23    A.  He does.
24    Q.    And according to this, Jeffery Leggett
25  underwent one on June 11th at 2:01 a.m. Is that right?

1    A.  (Reviews documents)
2        MR. HESTER: It's document 19.
3    A.  It's HC-00019, and I think it --
4        MR. HESTER: I believe it's a two-page
5      document, Sheriff, if you want to see both pages
6      before you testify about it.
7    A.  All right. And I don't believe -- well --
8        MR. HESTER: I'm sorry. I misspoke on
9      that. I have two copies on mine. It's a
10      one-page document. I apologize.
11    A.  It says he's been arrested before. Says
12  "Inmate stated he or she is thinking about killing
13  oneself. If yes, notify the supervisor." And it says
14  "No."
15  BY MR. TURNAGE:
16    Q.    Okay. That was on June 11th. Right?
17    A.  Okay. Well, but that's the -- I mean, that's
18  what you asked me about was this one on June 11th.
19  Right?
20    Q.    Right. That he underwent --
21    A.  So that was before he went to the hearing.
22    Q.    Right.
23    A.  Right. So this -- everything was conducted
24  according to the way that it should have been, and he
25  responded to the negative.

1    Q.    Right. So now we know that they -- what I'm
2  trying to ask is: He's taken out of the jail.
3    A.  Right.
4    Q.    Taken to the hearing on the 13th.
5    A.  Right.
6    Q.    And he has the hearing.
7    A.  Right.
8    Q.    The order is entered saying he's mentally ill
9  and in need of treatment --
10    A.  Right.
11    Q.    -- and protection from himself, and the order
12  is sent back by the transport officer to the booking
13  station.
14    A.  Right.
15    Q.    And my question was: How did the booking
16  officer -- at that time, did he undergo another
17  screening?
18    A.  All right. Now, at that point --
19        MR. HESTER: I'm going to object to the
20      form. You said protection from himself. That's
21      not what the judge's order says.
22        MR. TURNAGE: Okay. Well --
23        MR. HESTER: It says for his protection
24      and for the protection of others. I don't mean
25      to split hairs with you. We need to use the

1      exact words used by the judge.
2  BY MR. TURNAGE:
3    Q.    For his protection and the protection of
4  others.
5    A.  Okay.
6    Q.    All right. Now, it also notes that he was
7  off his medication. Right?
8        MR. HESTER: We're back to the judge's
9      order?
10        MR. TURNAGE: Yeah.
11        MR. HESTER: Okay. Document No. 2.
12  BY MR. TURNAGE:
13    Q.    And it also says recent violent threats --
14    A.  -- to his family and --
15    Q.    Okay. All right. Was he rescreened or
16  reclassified upon return from the court order?
17    A.  No. I don't think that there would be
18  anything that they needed to rescreen. I mean, after
19  he had been seen by that special master and that order
20  was issued, then that order should have been carried
21  out no matter how he answered the da- -- you know, the
22  questions.
23    Q.    And --
24    A.  Excuse me. I almost slipped. No matter how
25  he answered the questions, we had to follow the

1  directive of the court.
2      And I think if we follow this on down, we
3  find we -- we issued as a result of a failure to
4  communicate that judge's order dealing with Mr. Leggett
5  disciplinary action on the part of Shelby Barlow and
6  one other for their failure to transmit that -- that
7  court order.
8      Q.  When did that take place?
9      MR. HESTER:  If you know, Sheriff.
10     A.  The date on that, I can't give you.
11 BY MR. TURNAGE:
12     Q.  You say Shelby Barlow.
13     A.  That's correct.
14     Q.  And he was who?
15     A.  He was the booking officer that you asked me
16 what his first name was.
17     Q.  And who was the other person?
18     A.  I don't recall the other name.
19     Q.  Well, where would the documents be?  You said
20 it was two people disciplined.  Right?
21     A.  That's correct.
22     Q.  Which department did he work in?
23     A.  Booking.
24     Q.  So they were both in booking.  And what is it
25 that you say these people were disciplined for?

1      A.  For failure to provide that information from
2  that hearing to the appropriate staff that would
3  determine housing for him.
4      Q.  And who would they have given the information
5  to?
6      A.  To the officers who would be responsible for
7  placing him in a cell.
8      Q.  Okay.  You mean in the -- the officers who
9  worked what you referred to --
10     A.  I would say that they would put him under
11 suicide watch.
12     Q.  All right.  You're saying under your policy
13 and procedure, he should have been on suicide watch
14 after the court order?
15     A.  That's correct.
16     Q.  Where does your policy say that at?
17     MR. HESTER:  Let him look at the policy.
18     Hang on just a second.  I'm going to hand him --
19     I'm going to actually hand him two policies,
20     Ellis.  And do you want to find these in yours
21     and get the Bates number?  Starting with that
22     one, 92.
23     MR. TURNAGE:  140.
24     MR. HESTER:  You can look at -- Sheriff,
25     that's a two-page policy, and the next one is

1      that one.
2      MR. TURNAGE:  So we got -- what is it? --
3  140, 141?
4      MR. HESTER:  140 through 144, plus an
5  exhibit.  So, Sheriff, you may look at those
6  before you respond.
7      MR. TURNAGE:  All right.  So what we are
8  talking about in the numbered ones are going to
9  be HC-225, 226, 227, 228, 229, and 230.
10     MR. HESTER:  Okay.  His aren't numbered,
11 but yours are.
12 BY MR. TURNAGE:
13     Q.  And what do you say that this means?
14     MR. HESTER:  What what means?
15 BY MR. TURNAGE:
16     Q.  These pages here.  What do you say should
17 have happened under -- you're identifying these
18 pages --
19     A.  He should have --
20     Q.  -- as page --
21     MR. HESTER:  You want him to tell you what
22     they are?  Is that what you're asking?
23 BY MR. TURNAGE:
24     Q.  It says the title "Suicide Prevention
25 Program."  Right?  And this one says -- HC-230 says

1  "Suicide Prevention Watch Log."
2      A.  Um-hum.  (Affirmative)
3      MR. HESTER:  He's referring now to the
4      very last page of the document.
5      THE WITNESS:  Okay.
6  BY MR. TURNAGE:
7      Q.  Okay.  And you're saying that Officer Barlow
8  and one other person in the back booking area was
9  disciplined because they didn't do what?
10     A.  They did not inform those responsible for
11 housing Mr. Gresham -- Mr. Leggett -- in the proper --
12 in the proper manner.  He should have been placed on
13 suicide watch.  He would not be a candidate for general
14 population.
15     Q.  And you're saying he was put in general
16 population?
17     A.  If he was in the cell that you say he was in,
18 B-4, he was in general population.
19     Q.  What areas of the jail are suicide watch
20 people housed?
21     A.  In the -- near the booking area where they
22 can be under close observation.
23     MR. HESTER:  Can we recite for the record
24     which these policies are just so we can put them
25     in there.  The policy that he has in front of him

1     which is -- you read -- the suicide prevention
2     program is a policy. It's in Section G of the
3     manual we provided. It's Section J-G-05. And
4     then the next document is a four-page policy
5     document entitled "Suicide Prevention Program."
6        I didn't mean to interrupt. I just wanted
7     to have clarity in the record as to what we're
8     looking at.
9        MR. TURNAGE: Well, I think that we had
10    already identified them as the way that they were
11    Bates stamped.
12       MR. HESTER: His aren't Bates stamped, and
13    they are not exhibits is why I'm trying to make
14    that clear for the record.
15       MR. TURNAGE: But, again, we're talking
16    about pages 225 --
17       MR. HESTER: The ones you read are
18    correct.
19       MR. TURNAGE: -- through 230.
20       MR. HESTER: The ones you read are
21    correct.
22       MR. TURNAGE: HC-225 to HC-230. Those are
23    the documents we're talking about. Okay.
24 BY MR. TURNAGE:
25      Q. Did Mr. Leggett, while he was in the jail --

1 from the records I have been shown as being his jail
2 records, did he receive any psychotropic medication?
3 You know what psychotropic medication means. Right?
4      A. I do.
5      Q. Tell me what you understand it to mean.
6      A. What a psychiatrist can prescribe for you and
7 a psychologist can't.
8      Q. Right. A psychiatrist is a medical doctor.
9      A. That's correct.
10      Q. And does your jail staff have a psychiatrist
11 on staff every day?
12      A. Not every day, no.
13      Q. So did Mr. -- when does it have a
14 psychiatrist on staff?
15      A. At the present time I couldn't tell you which
16 days he's there.
17      Q. Back --
18      A. But we have enough folk there to keep him
19 busy, so I -- you know, probably two or three times a
20 week.
21      Q. On June the 14th -- June the 13th and the
22 14th --
23      A. I can't -- you can't expect me to remember
24 that.
25      Q. Who the psychiatrist was?

1      A. Yeah. Or what days he was there.
2      Q. I have been provided Mr. Leggett's medical
3 records --
4      A. Um-hum. (Affirmative).
5      Q. -- from the jail. If he would have seen a
6 psychiatrist, shouldn't it have been notes --
7      A. It should have been.
8      Q. So is it reasonable to infer that if there is
9 no mention of a psychiatrist --
10       MR. HESTER: Sheriff, let him finish his
11    question before you try to answer it.
12       THE WITNESS: Okay.
13       MR. HESTER: Because y'all may not be on
14    the same page.
15 BY MR. TURNAGE:
16      Q. Well, let me ask the question this way:
17 Under the jail's policy and procedure, if an inmate
18 like Jeffery Leggett saw a psychiatrist, should it be
19 put into his medical record?
20      A. It should.
21      Q. It should be put in there.
22      A. Should.
23      Q. That would be the policy and procedure.
24      A. It should.
25      Q. If he received medication, psychotropic

1 medications, on the 13th and the 14th, should that have
2 been put into his medical record?
3      A. It should.
4      Q. Okay.
5       MR. HESTER: Which is the policy he's got
6    as you're talking about it, Ellis.
7 BY MR. TURNAGE:
8      Q. What's the name of this policy?
9      A. Which one?
10       MR. TURNAGE: The one -- emergency
11    psychotropic medication policy?
12       MR. HESTER: Yes.
13 BY MR. TURNAGE:
14      Q. Okay. It's pages HC-231 and 232?
15      A. Again, mine aren't numbered.
16      Q. It's --
17       MR. HESTER: No, 169 and 70.
18       MR. TURNAGE: 169 and 170.
19       MR. HESTER: And there's also a policy at
20    139 that will go along with it.
21       MR. TURNAGE: All right. Hold on one
22    second. All right. So we've got -- so actually
23    the 169 is HC-231. The 170 is actually HC-232.
24       MR. HESTER: Okay.
25       MR. TURNAGE: And you mentioned there was

1     a 139 on the left-hand side?
2          MR. HESTER: Page 139, yes, of the manual.
3          MR. TURNAGE: All right. 139 of the
4     manual. 139 is 224.
5     BY MR. TURNAGE:
6          Q.   And that is a -- mental health services.
7          A.   Correct.
8          Q.   Okay. So you have mental health
9     professionals on staff by the jail?
10         A.   Correct.
11         Q.   On staff. Are these Hinds County Sheriff's
12    Department employees, or are these -- or are they just
13    on contract?
14         A.   Some are on contract. The doctor's on
15    contract. He's not an employee. The nurses and LPNs
16    are employees.
17         Q.   Okay. And was -- I see you talk about
18    treatment at an on- or off site. On site would mean
19    the Hinds County Detention Center at Raymond.
20         A.   Correct.
21         Q.   And off site would mean they would be
22    transported to a doctor's office away from the jail.
23         A.   Doctor's office, hospital, clinic, anyplace
24    other than the jail.
25         Q.   So, now, from your knowledge and

1     understanding about Jeffery Leggett, on the 13th and
2     the 14th, was he provided any mental health care or
3     treatment?
4          A.   No.
5          Q.   Was he provided any psychotropic medications
6     on the 13th and 14th?
7          A.   Not to my knowledge.
8          Q.   And if we wanted to know for sure, it would
9     be in his medical records at the jail?
10         A.   Should be.
11         Q.   Which you have already produced.
12         MR. HESTER: Actually, the County produced
13    them, Ellis.
14    BY MR. TURNAGE:
15         Q.   Okay. Who would be the person about the
16    level of mental health care and the level of
17    psychiatric care and the level of medical care for an
18    involuntarily committed mental patient that was
19    available at the Hinds County Detention Center at
20    Raymond on June the 14th of 2007? Who would be the
21    best person to ask about that? The medical director?
22         A.   All right. Now, that --
23         MR. HESTER: Let me object to the form.
24         A.   Let's break that -- the question is a
25    little --

1     BY MR. TURNAGE:
2          Q.   All right. I'll ask it more simple.
3               If I wanted to know what services, medical or
4     psychiatric services --
5          A.   I don't necessarily have to have it too
6     simple, but it doesn't need to be as convoluted.
7          Q.   All right. All I'm trying to ask is who
8     would be the best person to find out the level of care
9     that was available to inmates on June the 14th of 2007
10    at the Hinds County Detention Center? Would that be
11    the medical director?
12         A.   Yes.
13         Q.   And you're telling me today you don't know
14    who the medical director was.
15         A.   No.
16         Q.   Who is the medical director now? You don't
17    know. You just hired him yesterday.
18         A.   Now, I -- that's -- yeah.
19         Q.   All right. I got you.
20         A.   But, see, we're still doing that same thing
21    over again that you were doing.
22         Q.   I asked that question before, and you told
23    me --
24         A.   Yeah.
25         Q.   -- you just hired him. Okay. All right.

1               Now that we know that the booking -- you say
2     that your testimony is that the booking officers failed
3     to provide information to the jail staff.
4          A.   Saying those officers who had that
5     information, Shelby Barlow and one other, who were
6     responsible for communicating that to the officers who
7     were responsible for housing Mr. Leggett, that's where
8     the breakdown was.
9          Q.   But I thought that where an inmate goes was
10    done in the classification department.
11         A.   It is, but that was really pretty simple. If
12    he's a -- if he's a mental patient, he needs to be on
13    suicide watch. That could be done right there.
14         Q.   And you're saying that -- which area of the
15    jail are you saying where you would keep him?
16         A.   You don't have it on there. It's not -- it's
17    not on that diagram.
18         Q.   What area of the jail is it, then?
19         A.   Back here. (Indicating)
20         Q.   The holding area?
21         A.   Yeah.
22         Q.   It says "holding" right here. It says
23    "medical" right here.
24         A.   Yeah.
25         Q.   Is this -- okay.

1    A.   You need to go through and walk through it.
2    There's no way I can tell you how to do it with that
3    diagram that you have. You don't have the whole thing
4    there.
5        Q.   Okay. So which direction of the jail is it,
6    would you say? Which end of it -- north, east, west,
7    or south end?
8        A.   It would be on the east side.
9        Q.   The east side.
10   A.   Yeah.
11       Q.   Is there an entrance on the east side?
12   A.   Yeah. There's a sally port down there.
13       Q.   A sally port.
14   A.   Yeah.
15       Q.   Entrance.
16   A.   Yeah.
17       Q.   And the area of the jail where you're saying
18   where that Mr. Leggett should have been housed is
19   called what? The isolation cells?
20   A.   No. I didn't --
21       Q.   What were they --
22   A.   They are isolation cells from the standpoint
23   that they are single occupancy. Two of them are
24   padded.
25       Q.   And what do you refer to those cells -- what

1    are they referred to by the jail staff?
2        A.   Well, there's holding, booking, isolation
3    cells, people locked up for their own protection,
4    protected custody. The two cells that are padded are
5    used for mental patients.
6        Q.   And they are on the east side of the jail.
7        A.   Correct.
8        Q.   And what do y'all refer to it as?
9        A.   The zoo.
10       Q.   The zoo?
11   A.   Yeah.
12       Q.   For real?
13   A.   Yeah.
14       Q.   Who's over that area of the jail?
15   A.   Well, it depends on what -- you know, what
16   shift.
17       Q.   Okay. This happened on -- this would have
18   been --
19   A.   And, again, you're asking me to go back and
20   answer a question that it's impossible for me to answer
21   without having those records in front of me.
22       Q.   All right. I think that we've already
23   established that the court order established that
24   Jeffery Leggett was an involuntarily committed mental
25   patient on the 13th and the 14th at the Hinds County

1    Detention Center. Right?
2        A.   Repeat your question.
3        Q.   That Jeffery Leggett was an involuntarily
4    committed mental patient during his confinement at the
5    detention center on June the 13th and the 14th after
6    this court order was entered.
7        A.   Correct.
8        Q.   And you agree that Jeffery Leggett committed
9    suicide in the Hinds County Detention Center on June
10   the 14th of 2007 by hanging himself. Right?
11   A.   Correct.
12       Q.   And you agree that Mr. Leggett had some
13   serious psychiatric and medical needs on the 13th and
14   the 14th during his confinement at the jail. Right?
15   A.   Now, I can't -- you know, I can't answer
16   that.
17       Q.   Do you agree with it or not?
18   A.   Do I agree with what?
19       Q.   That he had some serious psychiatric needs.
20       MR. HESTER: Object to the form of the
21   question. He said he couldn't answer it.
22   A.   I can't answer --
23   BY MR. TURNAGE:
24       Q.   Okay.
25   A.   -- what his psychiatric needs are.

1        Q.   He never -- is part of the reason why you
2    can't answer is because he was never evaluated by a
3    psychiatrist?
4        A.   No.
5        Q.   What's the reason?
6        A.   It's because I'm not one.
7        Q.   Okay. Well, that's fair, Sheriff, but you
8    know that if a patient, a mental patient, who's not on
9    his psychotropic medication -- have you seen
10   patients --
11   A.   I've been sheriff 20 years, Mister.
12       Q.   You've seen it all.
13   A.   I've seen it all.
14       Q.   Okay. And you know how patients who take
15   their psychotropic medications act if they are on their
16   medication. Is that right?
17   A.   Well, again, that's going to be difficult for
18   me to answer. And I'm not trying to be difficult with
19   you, but that's -- you know, that calls for a --
20   well --
21       Q.   Let's look back at this court order again.
22       MR. TURNAGE: I think that's yours.
23       MR. HESTER: Ellis, to give you fair
24   notice of what we're going to contend to be
25   related so you can ask the sheriff about it:

1    There's another policy which is found on page 38.
2    I'm not meaning to interrupt your line of
3    questions, but it's entitled "Communication on
4    special needs patients." It is a two-page
5    policy.
6         MR. TURNAGE: 38 and 39?
7         MR. HESTER: Um-hum. (Affirmative).
8         MR. TURNAGE: 38 is HC-112?
9         MR. HESTER: Yeah.
10        MR. TURNAGE: And 39 is HC- 113?
11        MR. HESTER: Yeah, if you say so. I don't
12   have mine numbered, but, yeah, looks like it.
13        MR. TURNAGE: So are you saying that
14   Jeffery Leggett was a -- on June the 13th and the
15   14th was a special needs patient?
16        MR. HESTER: I'm just telling you that's a
17   policy you didn't discuss before, and I'm giving
18   you fair notice that it's going to be something
19   that's going to be used in the case, and you've
20   got it. If you want to ask him about it, it's in
21   front of him.
22   A.   All right. Now, repeat the question for me.
23 BY MR. TURNAGE:
24   Q.   Are you saying that Jeffery -- that this
25 policy HC- 112 and 113, were applied to Jeffery Jerome

1  Leggett during his detention at the Hinds County
2  Detention Center in June 10 through 14, 2007?
3    A.   I think that court order would constitute
4  everything that we would need to know about
5  Mr. Leggett's condition and whether or not he was a
6  special needs patient or not.
7    Q.   Okay.
8    A.   No matter what he was doing, that court order
9  would take preference. I mean, it would take
10 precedence.
11   Q.   Okay. You would agree that you know Mr. --
12 what was that name? Shelby Barlow?
13   A.   Right.
14   Q.   And you're saying that him and this other
15 person in booking failed to communicate the
16 court-ordered information about Mr. Leggett --
17   A.   That's correct.
18   Q.   -- to the jailers who were going to have him.
19   A.   That's correct.
20   Q.   You would agree that you, as sheriff, you got
21 a duty to supervise your staff. Right?
22        MR. HESTER: Object to the form of the
23   question.
24   A.   That's right.
25

1  BY MR. TURNAGE:
2    Q.   And your undersheriff and the other -- your
3  other supervisors and subordinates that we talked about
4  earlier, they have a duty to supervise as well. Right?
5    A.   And with -- and with 500 employees, I have
6  the responsibility and authority to delegate.
7    Q.   Right.
8    A.   And when people don't perform those duties
9  that they've been delegated to and don't live up to
10 their responsibilities, they have to wind up being
11 disciplined.
12   Q.   Right.
13   A.   So that's what was done in this case.
14   Q.   And what discipline did they receive?
15   A.   If you'll hold on just a minute.
16        MR. HESTER: If you know.
17   A.   I can't answer now.
18 BY MR. TURNAGE:
19   Q.   But there would be some document -- there's a
20 file in their personnel file somewhere that would show
21 what they received. Right?
22   A.   Correct.
23   Q.   Okay. Let's look at paragraph 7 of this --
24 of this order that we were talking about earlier.
25 Paragraph No. 7. You want to read it into the record

1  for us? That's paragraph 7 right there.
2        MR. HESTER: Starting at the bottom of the
3    first page.
4    A.   "The respondent, by clear and convincing
5  evidence, is a mentally ill person who poses a
6  substantial likelihood of physical harm to himself or
7  others."
8  BY MR. TURNAGE:
9    Q.   That was in the court order. Right?
10   A.   That's correct.
11   Q.   Okay. And you agree that the Judge Wise
12 order stated that Leggett was to be held in the Hinds
13 County Jail for holding for his protection and the
14 protection of others. Right?
15   A.   Correct.
16   Q.   And you agree that Judge Wise's June 13th,
17 2007, order of commitment for Jeffery Leggett provided
18 you and the Hinds County Detention Center at Raymond
19 staff and jailers notice and knowledge that he was in
20 need of protection from himself. Right?
21        MR. HESTER: Object to the form of the
22   question. It's a total mischaracterization of
23   his testimony.
24 BY MR. TURNAGE:
25   Q.   You can answer the question.

1     A.  I won't answer it.

2     Q.  **Well, he didn't tell you not to answer it.**

3     MR. HESTER:  You're mischaracterizing what

4  he told you, Ellis, and be fair to him.  He said

5  he had no involvement with this man.

6     MR. TURNAGE:  I didn't say him.

7     MR. HESTER:  Yes, you did.  You said you

8  and the Hinds County Detention Center.

9  BY MR. TURNAGE:

10    Q.  **All right.  So you say you never saw the**

11 **court order.  Right?**

12    A.  That's correct.

13    Q.  **All right.  But then your detention center**

14 **staff, they would have seen it.  Right?**

15    MR. HESTER:  If you know.

16    A.  I know that Shelby Barlow saw it.

17  BY MR. TURNAGE:

18    Q.  **And you don't know who else saw it.**

19    A.  I know there was one other person that saw

20  it, but I can't give you their name now.  Not that I

21  won't give you their name; I can't give you their name

22  now.

23    Q.  **Okay.  How many other suicides by hanging**

24 **have occurred in the Hinds County Jail facility?**

25    MR. HESTER:  For what time frame?

---

1  BY MR. TURNAGE:

2    Q.  **Before June the 14th of 2007.**

3    A.  Before June the 14th of 2007, one, possibly

4  two.  And that's with 12,000 people a year booked for

5  -- since we opened in '94.

6    Q.  **That's according to your testimony.**

7    A.  No, that's according to the truth.

8    Q.  **That's the document --**

9    A.  You can call it my testimony if you want to.

10  That's the truth.

11    Q.  **And the documents that you sent in to the**

12 **state medical examiner's office and to the United**

13 **States Attorney General in Washington are going to say**

14 **that there's only --**

15    A.  Going to reflect that --

16    Q.  **-- two?**

17    A.  -- exactly what I told you.

18    Q.  **How many people been killed in the jail?**

19    MR. HESTER:  Object to the form of the

20  question.  Also object on the basis that it's not

21  relevant to the issue of qualified immunity, nor

22  is it reasonably calculated to lead to the

23  discovery of admissible evidence as phrased,

24  unless you care to narrow that to a suicidal

25  condition.

---

1     MR. TURNAGE:  I don't think I'm limited to

2  suicidal conditions, so if you're instructing him

3  not to answer, that's one thing.

4     MR. HESTER:  No.  I'm just making my

5  objection for the record.

6  BY MR. TURNAGE:

7    Q.  **Well, when do you say that these --**

8    A.  Well, I mean, see, the problem I have with

9  this is --

10    MR. HESTER:  Let him finish his question.

11  I don't mean to interrupt you, Sheriff.  Just let

12  him --

13  BY MR. TURNAGE:

14    Q.  **My question was:  How many other suicides by**

15 **hanging have occurred in the Hinds County Jail**

16 **facilities?  You've got three facilities.  Right?**

17    A.  But which one did you refer to?

18    Q.  **I said in all three of them, hinds County**

19 **Jail facilities.**

20    A.  No, that's not what you said.  You said the

21  Hinds County Detention Center --

22    Q.  **Okay.**

23    A.  -- referring to the one where Mr. Leggett

24  committed suicide.  That was my understanding of your

25  question.  My response to that was one.

---

1    Q.  **All right.  Now --**

2    A.  Now --

3    Q.  **-- you got the Hinds County Detention Center**

4 **downtown.  How many have occurred there?**

5    A.  That's correct.  Two that -- in the 20 years

6  I've been sheriff.

7    Q.  **And at the Hinds County penal farm, how many**

8 **have occurred there?**

9    A.  None that I know of.

10    Q.  **So you're saying it was one at the detention**

11 **center at Raymond, which is Jeffery Leggett.**

12    A.  Right.

13    Q.  **And the other two --**

14    MR. HESTER:  That's not what he said,

15  Ellis.  You're mischaracterizing his testimony.

16  You said before that day.

17  BY MR. TURNAGE:

18    Q.  **Okay.  All right.  Before June the 14th, you**

19 **said there had been one suicide death --**

20    A.  That's right.

21    Q.  **-- at the detention center at Raymond.**

22    A.  Right.

23    Q.  **Who was that person?**

24    A.  I don't remember.

25    Q.  **How long ago was it?**

1    A.  I don't remember.

2    Q.  Okay. Now, at the detention center

3 downtown --

4    A.  Right.

5    Q.  -- Jackson, before June the 14th of 2007, how

6 many had there been?

7    A.  First one was '92, and the second one was

8 about 1998.

9    Q.  And where --

10    A.  It's a pretty good record, isn't it, for that

11 number of people housed in -- and being responsible and

12 supervising for -- you know, for the last 20 years.

13    Q.  1992 and 1998 at the detention center

14 downtown.

15    A.  Um-hum. (Affirmative)

16    Q.  And one at the Hinds County Detention Center

17 at Raymond before Jeffery Leggett on June the 14th.

18 What year was that?

19    A.  Don't remember that.

20    Q.  Was it, I mean, in the 2000s or in the '90s?

21    A.  I think it was in the '90s, yeah.

22    Q.  Now, these were suicide by hanging deaths.

23 Right?

24    MR. HESTER: Object to the form of the

25    question. He didn't say that.

---

1    MR. TURNAGE: Well, that was my question

2    is how many other suicide by hanging deaths have

3    occurred in the Hinds County facilities.

4    MR. HESTER: Your question was how many

5    other suicides. You may have meant to say

6    "suicide by hanging," but you asked him about

7    suicides.

8 BY MR. TURNAGE:

9    Q.  Well, how did these other -- these other

10 three you told me, how did they commit -- we know Jeff

11 Leggett hanged himself.

12    A.  All were by hanging.

13    Q.  So they all were by hanging.

14    A.  Yeah.

15    Q.  So four hanging deaths?

16    A.  Correct.

17    Q.  All right. Have there been other deaths of

18 mental patients in your jail? Not by hanging, but just

19 other deaths?

20    MR. HESTER: If you know.

21    A.  There was one other death of an inmate who

22 refused medical care and died as a result of the

23 infection.

24 BY MR. TURNAGE:

25    Q.  What was his name?

---

1    A.  I don't remember.

2    Q.  What year are we talking about?

3    A.  About two years ago.

4    Q.  What about any other injuries to mental

5 patients that have been placed in your jail by a

6 chancery court order?

7    A.  None to my knowledge. Well, when you say --

8 will you quantify that?

9    Q.  Two mental patients get to fighting --

10    A.  I mean qualify.

11    Q.  -- and beat each other up.

12    MR. HESTER: I'm going to object to the

13    extent that you haven't laid a predicate for the

14    fact that this ever occurred, Ellis.

15    A.  And you're starting to sound like, Ellis,

16 like you're mad at me over that. I -- you know, I just

17 -- I'm having a real hard time. I can't help it if

18 they want to whip each other's asses. That's just part

19 of the game.

20 BY MR. TURNAGE:

21    Q.  Well, okay. Well, I didn't mean that.

22    A.  Well, but -- no, you're getting increasingly

23 testy about this, and all I'm doing is telling you the

24 truth; so --

25    Q.  Do you remember a case that you were sued in

---

1 Clark v. Malcolm McMillin --

2    A.  Who?

3    Q.  -- involving an incident on October the 8th

4 of 1994 in the Hinds County Detention Center where

5 Donald Strong was assaulted and killed by a fellow

6 inmate, Jason Fields? The two had been placed together

7 in a cell and both was on suicide watch. You don't

8 remember that?

9    A.  Oh, yeah, I remember Jason Fields well.

10 Yeah. Yeah, I do. That's been -- didn't remember them

11 being on suicide watch, though. There wasn't anything

12 -- Jason wasn't going to kill himself. He might have

13 killed you, but he wouldn't have killed himself.

14    Q.  Do you remember a guy named Michael --

15 Michanglo Smith that sued you --

16    A.  Oh, yeah. Look, it doesn't surprise me

17 anybody suing me now.

18    Q.  Well, but listen --

19    A.  We're not talking about suing, are we?

20    Q.  No. I'm talking about he alleges that on

21 October the 13th, 2004, that he was assaulted by gang

22 members and injured in your jail.

23    MR. HESTER: Who is this?

24    MR. TURNAGE: M-I-C-H-A-N-G-L-O, Smith.

25    A.  Michanglo Smith.

1  BY MR. TURNAGE:
2      Q.  Right.
3      A.  Yeah.
4      Q.  And said that y'all failed to protect him
5  from the assault and attempted to cover up the
6  incident.
7          MR. HESTER:  Are you asking him about
8      suicides or assaults?  I'm sorry.
9          MR. TURNAGE:  Well, I asked him -- I had
10     asked him previously about if there had been
11     other assaults and injuries in his jail, and he
12     told me that there hadn't been any.
13         MR. HESTER:  I don't think -- did you say
14     that?
15         THE WITNESS:  I don't -- I don't -- I
16     don't think so.
17 BY MR. TURNAGE:
18     Q.  I asked you about --
19     A.  If I did, I misunderstood the question.
20 Because to imply that I don't have any fights and that
21 folk out there -- you know everybody out -- you know,
22 there are a lot of -- lot of bad folk in that jail.
23     Q.  Okay.  All right.  How many inmates -- I'm
24 going to ask you this question again, and I want to
25 make sure that I state it right this time.

1          How many inmates have died or been killed
2  while confined to a Hinds County Jail facility?
3  Meaning either one of the three.
4          MR. HESTER:  Object to the form of the
5      question.  It's compound in nature.  Dying is one
6      thing; being killed is --
7  BY MR. TURNAGE:
8      Q.  All right.  I'll ask you the first one, then.
9          How many people have died while confined to
10 the Hinds County Jail facility?  Either one of them.
11     A.  I couldn't answer that question.
12     Q.  How many have been killed while confined to
13 the Hinds County --
14     A.  I couldn't answer that question without --
15 without doing some research.
16     Q.  And the research that you're going to go and
17 look at are those reports you sent in to the state
18 medical examiner's office and to the USAG's office.
19 Right?
20         MR. HESTER:  Object to the form of the
21     question.
22 BY MR. TURNAGE:
23     Q.  Is that right?
24     A.  Well, I would imagine that would be one of
25 the sources.

1      Q.  What would be the other source?
2      A.  Of any -- any documentation that we have of
3  that.
4      Q.  And what kind of documentation would you
5  have?
6      A.  Any reports of that.
7      Q.  And where do you keep these reports?
8      A.  On file --
9      Q.  At your office?
10     A.  -- in the investigative division.  Yeah.
11     Q.  At the 407 East Pascagoula Street location?
12     A.  Um-hum.  (Affirmative)
13     Q.  Yes or no?
14     A.  Yes.
15     Q.  And who would be over -- the administrative
16 -- Ms. Alma -- what you told me her name was?
17     A.  Heard.
18     Q.  Your administrative assistant.
19     A.  Heard.
20     Q.  Alma Heard.
21     A.  Call her.  She'll be glad to talk with you.
22         MR. HESTER:  Actually, you probably should
23     go through me, but -- you know, just for clarity.
24 BY MR. TURNAGE:
25     Q.  As sheriff for 20 years, you agree that

1  suicide is recognized as a leading cause of death in
2  jail and detention facilities.
3          MR. HESTER:  Object.
4      A.  Not in my jail, it's not.
5  BY MR. TURNAGE:
6      Q.  What's the leading cause, then?
7      A.  What's the leading cause of what?
8      Q.  Death in your jail.
9          MR. HESTER:  Object to the form of the
10     question to the extent that it assumes there is a
11     leading cause of death in his jail.  You haven't
12     established that.
13         MR. TURNAGE:  Well, he told me about the
14     deaths that he knew about.
15         MR. HESTER:  I know, but you haven't
16     established that there is a leading cause.
17         MR. TURNAGE:  Well --
18         MR. HESTER:  Or that there is anything
19     that could be characterized as leading cause or
20     that it's --
21     A.  Well, I could have one that's -- hell, I got
22 one with tooth decay.  How about --
23         MR. HESTER:  I'm not telling him not to
24     answer --
25         MR. TURNAGE:  All right.

1          MR. HESTER: -- your question. Okay?
2  BY MR. TURNAGE:
3      Q.   Listen to my question.
4          MR. HESTER: Let me finish. Okay? I'm
5  not trying to interrupt you. If I say the words
6  "Sheriff, don't answer the question," I'm telling
7  him not to answer the question. If I don't say
8  those words, I'm not telling him not to answer.
9      Sheriff, you can answer the question if you
10  know what he's asking you.
11     A.   Okay. Well, one of them -- I don't know what
12  percentage tooth decay would have in it, but we had one
13  man died of tooth decay. All right? Infection.
14  Refused medical treatment and died as a result of it.
15  Can't force him to take medical treatment. You know,
16  now, maybe he was -- maybe he was insane, but they took
17  a -- you know, he had an opportunity to be examined, to
18  have medical treatment; didn't take it.
19     I don't have a nest out there where people
20  commit suicide and murder one another, and I resent the
21  implication and the direction of your questions. And,
22  I mean, I know that's your job and that's what you have
23  to do, but see, I don't have to like it either.
24  BY MR. TURNAGE:
25     Q.   Well --

1      A.   And I'm going to stand up for what I do and
2  for my reputation; and my reputation in the community
3  for the last 20 years in running the jail is running
4  one right.
5      And if -- I can't tell you how angry that it
6  makes me. Of course, that's not your job. Your job is
7  to represent your client, and my job is to defend
8  myself. Well, I mean, my counsel's job is to defend
9  myself.
10     So you forgive me if it gets a little rise
11  out of me when you do that, because I've tried to do
12  things right the time that I've been in office, and I
13  don't like being subjected to this.
14     Q.   But listen at my question --
15     A.   I'll listen to your question.
16     Q.   Well, we're going to get through it, Sheriff,
17  I promise you, one way or the other.
18     A.   Yeah. Well, I mean, that's fine.
19     Q.   You told me that -- before I get back to this
20  question, what year did the guy die from the infection
21  from a tooth problem?
22     A.   I guess about five years ago.
23     Q.   Okay. And, now, I think that we did identify
24  that there were a suicide by hanging death in '90, '92,
25  '98, and 2007. That's four. Right?

1      A.   Um-hum. (Affirmative)
2      Q.   And you agree -- is that yes or no?
3      A.   Yes.
4      Q.   And you agree with me that the other death
5  that you told me about was the Jason Strong and -- what
6  did I say his name was?
7      A.   Jason Lomax.
8      Q.   No, it wasn't Jason Lomax. It was --
9      A.   -- Fields.
10     Q.   This was -- Donald Strong was assaulted and
11  killed by a fellow inmate, Jason Fields.
12     A.   That's --
13     Q.   That happened in '94 also. Right?
14     A.   Okay.
15     Q.   So we know that that's five. Now, have there
16  been other deaths in your jail that you know about?
17     A.   Not to my knowledge.
18     Q.   All right. So out of the five that you have
19  knowledge of today, four of them were from suicide and
20  one of them was from assault. Right?
21     A.   Yeah. Well, one is --
22          MR. HESTER: Allegedly.
23     A.   -- one is too many.
24          MR. HESTER: Allegedly. Objection.
25

1  BY MR. TURNAGE:
2      Q.   So even at your jail, suicide has been the
3  leading cause of death. Right?
4          MR. HESTER: Object to the form of the
5  question.
6  BY MR. TURNAGE:
7      Q.   It's five deaths, and suicide was four.
8  That's 80 percent of the deaths at your jail was
9  suicidal by hanging. Right?
10          MR. HESTER: I object. That's a
11  mischaracterization of his testimony. That's 80
12  percent of what you've told him about.
13          MR. TURNAGE: Well, that's all that we
14  know about right now between me and him.
15  BY MR. TURNAGE:
16     Q.   Is that true?
17     A.   According to what you say, it is.
18     Q.   Okay. And you agree that jail and suicide
19  experts have developed certain standards to train jail
20  officials to recognize those at risk for suicide.
21  Right?
22          MR. HESTER: Object to the form of the
23  question. It's ambiguous, and there's no
24  predicate for it; and you're asking him to
25  comment on what third parties have done in the

1  context of a qualified immunity deposition. It's
2  not proper, Ellis. I'm going to object to the
3  form. If he has knowledge of the entire world's
4  knowledge and what they've said and so forth, he
5  can answer.
6  A. I can't answer it.
7  BY MR. TURNAGE:
8  Q. So you're not aware that jail and suicide
9  prevention experts have developed certain standards to
10  train jail officials to recognize those that are at
11  risk for suicide.
12  MR. HESTER: Object to the form.
13  A. I can say that -- that we have trained our
14  jailers with suicide prevention and recognizing suicide
15  tendencies, let's say, or doing suicide screening when
16  inmates come into the jail. I can testify as to what
17  we can do.
18  BY MR. TURNAGE:
19  Q. And you agree that your jail staff and
20  officials have a duty to protect inmates known to be at
21  risk for suicide. Right?
22  MR. HESTER: Object to the form of the
23  question. To the extent you ask about duty,
24  you're necessarily asking him for a legal
25  conclusion. As such, object to the form of the

1  question. If he can answer from a factual
2  perspective, Sheriff, you may respond if you deem
3  appropriate.
4  A. Repeat the question.
5  BY MR. TURNAGE:
6  Q. You agree that you as sheriff and your jail
7  staff and officials have a duty to protect inmates who
8  are known to be at risk for suicide. Right?
9  MR. HESTER: Same objection. I'm going to
10  add to that that your question is ambiguous.
11  But, Sheriff, if you understand what he's asking,
12  you may answer.
13  BY MR. TURNAGE:
14  Q. Well, you know what a duty is. Right?
15  A. I do know what a duty is.
16  Q. What do you say a duty is?
17  A. It's my obligation.
18  Q. And so if you know that someone has -- that's
19  known to be at risk for suicide, they are saying --
20  A. It's my obligation to watch them.
21  Q. Okay. And to protect them from themselves.
22  Right?
23  A. Correct.
24  Q. When did you learn about Jeffery Leggett's
25  history of mental problems?

1  MR. HESTER: Object to the form of the
2  question.
3  A. I couldn't -- I couldn't answer that
4  question.
5  BY MR. TURNAGE:
6  Q. You do know that he has a long history of
7  mental problems, though, now, don't you?
8  A. I -- now I know that he had mental problems.
9  Now I know that Judge Wise signed that paper on him.
10  Q. Okay. Who is the top person in charge of
11  suicide prevention and training at the Hinds County
12  Jail facility?
13  A. The officer in charge of training now is --
14  THE WITNESS: Alisha?
15  MS. AINSWORTH: Van Egmond.
16  A. Van Egmond.
17  BY MR. TURNAGE:
18  Q. Van, V-A-N?
19  A. Rick --
20  MS. AINSWORTH: -- Van Egmond.
21  A. Rick Van, V-A-N, Egmond, E-G-M-O-N-D.
22  BY MR. TURNAGE:
23  Q. And what's his job title?
24  A. Training officer.
25  Q. For the Hinds County --

1  A. -- Sheriff's Office.
2  Q. -- Sheriff's Office. And I think we've
3  already talked about your inmate suicide prevention and
4  training policies. Right?
5  A. Right.
6  Q. You've identified several policies that you
7  have on it.
8  A. Right.
9  Q. Who wrote those policies?
10  A. Well, at the time -- to be perfectly honest
11  with you, at the time these policies were written when
12  we first opened the jail, it was a collaborative effort
13  on the part of a number of people, and as to who was
14  specifically was responsible for writing those, I
15  couldn't answer that.
16  Q. But you officially adopted them.
17  A. Yeah. Yeah, I signed them.
18  Q. And you don't know who it was that actually
19  -- the people's name -- you can't tell me the people's
20  name who drew them up?
21  A. Now, again, you're going back to the same
22  thing with me when I have to tell you I don't know.
23  And you know -- you know good and well that I don't
24  know. We're going back 20 years, and you're asking me
25  who wrote the policies 20 years ago.

1    Q.   Well, the current policies -- Rick Van Egmond
2  is the person that trains your staff on them.
3    A.   That's correct.
4    Q.   On suicide prevention.
5    A.   That's correct.
6    Q.   So he should know more about --
7    A.   That's correct.
8    Q.   -- the policy.  Okay.
9         Where is the training curriculum?  He would
10  know that?
11   A.   He would.
12   Q.   And where you got it from?
13   A.   Right.
14   Q.   And when it was adopted?
15   A.   Right.
16   Q.   Do you agree that jail suicides are usually
17  accomplished with objects or clothing like socks or
18  belts or shoelaces, shirts, or sheets or towels?
19       MR. HESTER:  Object to the form of the
20       question.  You can answer if you understand.  I
21       don't think a proper predicate's been laid for
22       that.
23   A.   If what we said earlier is true, that those
24  hangings in the jail were -- you know, that's how the
25  suicides were committed, then it would follow that what

1  you just said was true.
2  BY MR. TURNAGE:
3    Q.   And, in fact, the ones that -- we know
4  Jeffery Leggett used sheets.  Right?
5    A.   Correct.
6    Q.   What was the other three you told me about?
7  What did they use?
8    A.   One used a T-shirt, undershirt.  Another one,
9  I think, used strips of a towel, and one used part of a
10  sheet.
11   Q.   Okay.  And I think that we -- Jeffery Leggett
12  used sheets.  Right?  According to those statements we
13  read earlier.
14   A.   Well, according to -- if that's what is in
15  the statements, that's what he used.
16   Q.   How many beds are at the Hinds County
17  Detention Center at Raymond?
18   A.   I think it's 590 or 586 that we can use.
19   Q.   And the detention center at Raymond is under
20  a federal court order in Gates v. Collier?
21   A.   That's right.
22   Q.   All right.  And the jail opened in 1994.
23   A.   That's correct.
24   Q.   And it's a direct supervision facility?
25   A.   That's correct.

1    Q.   Explain to me what a direct supervision
2  facility is.
3    A.   A direct supervision facility is operated in
4  such fashion that the -- that the inmates and the
5  detention staff are locked up together, not -- not
6  inmates behind bars and detention officers walking the
7  hall, which is what most people envision.
8    Q.   Where are the telephone and visiting record
9  logs kept at?
10   A.   All right.  Well, when it comes to those who
11  are in housing units, there are no telephone logs.  An
12  inmate wants to make a phone call, he goes to a
13  telephone mounted on the pillars there, and they -- and
14  the housing unit operator answers.  He calls collect
15  the party that he wants to speak with.  Then that party
16  has to take -- has to pay for the call.
17       Same way happens with a -- with an inmate
18  that comes in the jail.  He's booked in.  He's allowed
19  a phone call.  He goes out.  There's no toll charge for
20  the phone call.  It's just got to be somebody on the
21  other end and willing to pay for the call.
22   Q.   Okay.  All right.  I think you agreed with me
23  earlier that the documents show that Jeffery had been
24  incarcerated before.  Right?
25   A.   I don't know if I did or not, but --

1    Q.   Okay.  Have there been -- we talked about
2  suicide deaths, four of them.
3    A.   Um-hum.  (Affirmative)
4    Q.   Have there been suicide attempts at any of
5  the three --
6    A.   Yeah, there have been attempts.
7    Q.   How many attempts have there been?
8    A.   I couldn't -- I couldn't answer that.
9    Q.   But these attempts have been before June the
10  14th of 2007?
11   A.   There have been -- yeah, there have been
12  attempts before.
13   Q.   What about after June the 14th of 2007?
14   A.   None that I can recall now.
15   Q.   Who would be the best person to tell me where
16  these incident reports --
17   A.   I think Major Rushing would be a good source
18  of information for you for that.
19   Q.   And that was because y'all -- the top ranking
20  officials have meetings how often?
21   A.   Well, they have them at the jail.  I don't
22  have to attend those.
23   Q.   Okay.
24   A.   They run the jail.
25   Q.   And the incident reports would be sent to --

1 from the housing pods to the jail commander, which is
2 Major Rushing?
3   A.  That's correct.  That's correct.
4   Q.  And she would keep copies of them?
5   A.  That's correct.  Well, now, as to whether she
6 keeps copy of them or not, you'll have to ask Major
7 Rushing.
8   Q.  But a copy also would come to your office,
9 too, to your attention.
10   A.  Well, if it's a suicide, it will.  The
11 attempt might not.
12   Q.  Okay.  Was there any photographs made of the
13 cell where he hanged himself and the hanging scene?
14   A.  Are you -- I mean, you're not asking if there
15 were any photographs made of him hanging, are you?
16   Q.  Yeah.
17   A.  Well, I certainly would hope somebody wasn't
18 standing around taking pictures instead of trying to
19 cut him down and give him CPR.
20   Q.  Okay.  But, then, during the investigation,
21 wouldn't they have made photographs of the scene where
22 it happened at?
23   A.  Well, I mean, what would you take a picture
24 of?
25   Q.  The cell, the cell number.

1   A.  Every one of them looks alike.
2   Q.  Okay.
3   A.  Every number.
4   Q.  Aren't there video cameras in those cells?
5   A.  No.
6   Q.  There are no video cameras.
7   A.  No.
8   Q.  There never have been?
9   A.  No.
10   Q.  Okay.  According to those documents in there,
11 the statements from the officers, they say that this
12 guy -- that his cell mate was Antonio Clensey.  Right?
13 Did they ever get -- have you seen Antonio Clensey's
14 statement?
15   A.  Did you have me read it there when I read
16 those others?
17   Q.  It wasn't in there.
18   A.  Okay.  Then I didn't read it.
19   Q.  So you haven't seen it?
20   A.  No.
21   Q.  Do you know whether Internal Affairs took a
22 statement from Antonio Clensey, who was the roommate?
23   A.  I would assume that they did.
24   Q.  You would hope they did, anyway.
25   A.  Yeah, sure would.

1   Q.  Would it be a breach of your policies and
2 procedures if they didn't?
3   A.  It would be up to the investigator as to
4 whether -- who he interviewed there.
5   Q.  But --
6   A.  If I were the investigator, I would have
7 interviewed him.
8   Q.  Okay.  And I think you'd told me that you
9 never personally met Mr. Leggett.  Right?
10   A.  No.
11   Q.  And you told me you was at home when you
12 became aware of it, that you got a phone call.  Right?
13   A.  Right.
14   Q.  From your staff out at the jail.
15   A.  Right.
16   Q.  And under your policies and procedures, they
17 have a duty to call you and let you know of major
18 incidents.
19   A.  Correct.
20   Q.  And an inmate committing suicide under your
21 policy and procedures is definitely a serious incident.
22   A.  That's correct.
23   Q.  Okay.  And I think we've already talked about
24 your staff transported him to the chancery court
25 hearing, and you transported him back to the detention

1 center.  We've gone over that.
2       And you said that he was never placed in
3 protective custody on suicide watch because the booking
4 personnel didn't do what they should --
5   A.  The information -- the information was not
6 transmitted to them that he was in need of special
7 housing.
8   Q.  But they did get the court order.
9   A.  I think that's the question, as to whether or
10 not they got the court order.
11   Q.  What area of the jail is where a person's
12 going to be housed made at?
13       MR. HESTER:  I'm sorry.  Could you restate
14   that?
15 BY MR. TURNAGE:
16   Q.  All right.  The section of the jail where an
17 inmate is going to be housed, that's called the
18 classification of an inmate.
19   A.  And booking.
20   Q.  It's all in booking and classification.
21   A.  This is -- this is a hard one to try to --
22 back here in booking where these holding cells are,
23 there is an area where you book people in and you take
24 their pictures, you take their fingerprints.
25       All right.  Now, Mr. Welch doesn't want

1 anybody staying in those cells, in those drunk tanks
2 and holding cells, for more than 24 hours, so a
3 decision has to be made as to where to place him within
4 general population in order to comply with that court
5 order. So he's in this holding cell.
6 First-in/first-out.
7 So if you're the first drunk that's arrested
8 that night, then you get out, you get the first cell
9 that's open, and they place you there.
10 All right. Then they are going to make a
11 determination the next day based on the crime that
12 you've committed, based on your past record, other
13 things available to them as to where you're going to be
14 placed in the general pop- -- in -- within the
15 population of the jail.
16 If you're an escapee, you've been convicted,
17 or if you've failed to pay child support, if you've got
18 -- this is your fourth DUI, or you owe so much, you can
19 wind up being sent to the county farm the next day.
20 So some classification is done here at
21 booking. Then others are done when the complete review
22 of your record is made and the decision is made as to
23 where to put you within the jail population.
24 Q. Okay. All right. So the decision to put
25 Jeffery Leggett in B-4 was made on June the 13th when

1 he came back from the chancery court hearing. Right?
2 A. That's correct.
3 Q. And you're saying that he shouldn't have been
4 put in B-4; he should have been put in one of the
5 holding cells on suicide watch.
6 A. Put in a -- yeah, put in isolation.
7 Q. That's your testimony.
8 A. Yeah.
9 Q. Okay. You agree that you had participation
10 and involvement in the decision of the level of
11 staffing that was going to be at the detention center
12 at Raymond on June the 13th and the 14th. Right?
13 A. All right. Repeat that.
14 Q. All right. You're the sheriff. Right?
15 MR. HESTER: We'll stipulate to that.
16 A. Yeah.
17 BY MR. TURNAGE:
18 Q. Okay. And it was my understanding that as
19 sheriff, you were in charge of the courthouse, the
20 jail, and the prisoners --
21 A. Um-hum. (Affirmative)
22 Q. -- under this Statute 19-25-69. Right?
23 A. Right.
24 Q. And that you shall have charge of the
25 courthouse and jail in your county.

1 A. Right.
2 Q. And the prisoners in said jail.
3 A. Right.
4 Q. Okay. And, also, under 19-25-35, it's your
5 duty to take into custody and safely keep in your jail
6 in his county all persons committed by order of either
7 court, meaning the chancery or the circuit court.
8 A. Right. Right.
9 Q. Right?
10 A. Yeah.
11 Q. It's also your duty to keep a record of a
12 jail docket for every person that's received and placed
13 into your jail.
14 A. Now, I mean, I'm not trying out for this job.
15 I've been doing it for 20 years. All right? So, I
16 mean, I understand what you're saying. Now, what is
17 the question? Is there a question there with that?
18 Q. It's going to be a question.
19 A. Well, you know, I'm ready for it.
20 Q. And under 19-25-71, the sheriff -- you're the
21 jailer of your county, and you shall employ jailers or
22 jailers to have charge of the prisoners in your jail.
23 Right?
24 A. Right.
25 Q. So my question was earlier that as sheriff,

1 you are the person that determined the level of
2 staffing, the jailers, that you're going to have on
3 duty on any given shift.
4 A. Right.
5 Q. Right?
6 A. Right.
7 Q. And you're the person that's responsible for
8 making sure that you have enough.
9 A. Right.
10 Q. And the statute puts those duties and
11 responsibilities on you, the sheriff. Right?
12 A. Right.
13 Q. And you agree as sheriff that you have a duty
14 to supervise the jailers at the Hinds County Detention
15 Center.
16 A. That's correct.
17 Q. And you and your subordinates' supervisors
18 have a duty to supervise as well.
19 A. Right. Now, it's not -- again, I agree with
20 all that. Now, is it going to be a lecture, or is it a
21 question? Because I want -- I'm ready to answer a
22 question. I'm not ready for a lecture.
23 Q. Well, I'm just making sure that --
24 A. Well, then, ask the question.
25 Q. All right. You agree with me that you have a

1  duty to supervise the officers --
2      A. I already have agreed with you. I've agreed
3  with you every time you've said that today.
4      Q. And you agree that as sheriff, you and your
5  supervisory staff and the jailers have state law duties
6  to protect an inmate from himself. Right?
7          MR. HESTER: And I'm going to object to
8      the form of the question to the extent you're
9      again asking for another legal conclusion.
10  BY MR. TURNAGE:
11      Q. You can answer the question. Tell me you
12  agree with me or you don't agree with me.
13          MR. HESTER: I'm going to object to the
14      form of the question. It's asking for a legal
15      conclusion first. Secondly, as being an
16      incorrect and incomplete statement of the law, to
17      the extent you do ask a legal question.
18      Sheriff, if you understand, you may answer.
19      A. Repeat the question.
20  BY MR. TURNAGE:
21      Q. You would agree with me that after that court
22  order came back from the chancery court telling you
23  that Jeffery Leggett was in need of protection from
24  himself and from others --
25      A. Right.

1      Q. -- that as jailer, you and your jail staff
2  had a duty and responsibility to protect him.
3      A. They did.
4      Q. And they needed -- the protection that he
5  needed was from hanging himself. Right?
6          MR. HESTER: Object to the form of the
7      question.
8      A. Apparently.
9  BY MR. TURNAGE:
10      Q. How do you go about protecting an inmate from
11  hanging himself?
12      A. Okay. You still have policies and procedures
13  that people are supposed to comply with and do in order
14  to ensure that that type of thing doesn't happen; and
15  if it does happen, then you deal with it with proper
16  discipline.
17      Q. And you agree as sheriff that you was
18  responsible for the operations and the conditions of
19  confinement at the detention center in Raymond on June
20  the 13th through the 14th. Right?
21          MR. HESTER: Object to the form of the
22      question.
23  BY MR. TURNAGE:
24      Q. You can agree with me or you can disagree.
25      A. Then I'm going to ask you to repeat.

1      Q. All right. You agree that as sheriff -- you
2  were the elected sheriff of Hinds County.
3      A. Again, we're going through that? I don't
4  need you to tell me that I'm the elected sheriff of
5  Hinds County.
6      Q. And as elected sheriff, you were responsible
7  for the operation and the conditions at the Hinds
8  County --
9      A. I was then and I still am.
10          MR. HESTER: We're going to take a
11      five-minute break and let everybody calm down.
12          (OFF THE RECORD)
13  BY MR. TURNAGE:
14      Q. You would agree with me, Sheriff -- and,
15  again, you can agree or you can disagree. All you've
16  got to say is, "Ellis, I agree with you."
17      A. All right.
18      Q. Or "I don't agree with you," and we can move
19  on.
20      That as sheriff of Hinds County, you were
21  responsible for the health, the safety, and protection
22  of inmates and mental patients confined at the
23  detention center at Raymond on June the 13th through
24  the 14th. Right?
25      A. I agree.

1          MR. HESTER: Object -- well, I object to
2      the form of the question, but you can answer.
3  BY MR. TURNAGE:
4      Q. And you agree that your original staffing
5  plan at the Hinds County Detention Center at Raymond
6  required two unit pod control deputies.
7      A. I'd ask you to define those two pod control
8  deputies.
9      Q. Well, you told me earlier --
10      A. Tell me which one -- which ones they are
11  here.
12      Q. The pod control deputies are the ones that
13  you say that are stationed in the area in the red.
14      A. There were two of them there. Right?
15      Q. Right. When the jail first opened.
16      A. Oh, look, in -- let me say this to that: I
17  would put four in there if I could. Okay? And two at
18  each one of the housing units, if I could, but I can't.
19      Q. Well, tell me what the original staffing plan
20  required.
21      A. Well, there have been a number of original
22  staffing plans. One came with the builder of the
23  building; the other came with the architect; another
24  one came with the National Institute of Corrections;
25  one came from the board of supervisors; and one came

1  from me.

2      So to go back to the original plan on that,

3  you're going to have to go back to the beginning of

4  time and do an awful lot of reading, because that

5  changed over and over again.

6      Now, would I be satisfied or more than

7  satisfied to have two people in pod control, yes, and

8  then have somebody to go around and do relieving.

9  Would I be satisfied to have more than one person in

10  the housing unit -- particularly some housing units

11  have 66 men, some have 33 -- you know, yes, I'd like to

12  have more people, but I don't have more people.

13     Q.   Are you saying at one time you never had more

14  at the beginning?

15     A.  I think that's pretty close to right, yeah.

16  I've been -- I've been pretty level with that. We've

17  lost a lot of people over a period of time. We've --

18  you know, we have worked shorthanded before.

19     Q.   Ron -- you mentioned Ron Welch's name a while

20  ago. Right?

21     A.  Right.

22     Q.   Who is Ron Welch?

23     A.  Well, let me see if I can find it. I'll give

24  you his telephone number, but he is -- he's the

25  attorney for the affected class in the lawsuit Gates v.

1     Q.   For the operation of the jails?

2     A.  (Nods affirmatively)

3     Q.   Is that a recent case?

4     A.  Well, back to '93, '94.

5     Q.   Okay. So under the original staffing plan,

6  you're saying that the builder -- the builder of the

7  jail?

8     A.  Architect.

9     Q.   The architect?

10     A.  Architect, National Institute of Corrections,

11  board of supervisors, sheriff's department.

12     Q.   Well, how many staff did the architect

13  recommend?

14     A.  Now, you're -- again, you're asking me to go

15  back to 1994 and discuss with you this, and I didn't

16  come prepared to. I don't have my -- you know, I don't

17  have the -- the plans. I don't have the original

18  staffing analysis. I don't have any of that anymore.

19     Q.   But Mr. Welch would be a good person to go

20  to.

21     A.  I highly recommend him.

22     Q.   Okay. But you agree that as a general

23  proposition, that your original staffing plan or at

24  some point your staffing policy was that you would have

25  two unit pod control deputies.

1  Collier, so he determines the population, he determines

2  the number of -- the number of staff -- minimum number

3  of staff -- that I can have, the amount of square

4  footage per inmate, all of this, because, you know, it

5  comes under that court order.

6     Q.   So the federal court order --

7     A.  And he is not only with that, but in Wilson

8  v. Vickery, which is another lawsuit that we operate

9  under. So I'm sure he'd be glad to help you with any

10  questions that you might have about that.

11     Q.   He's the attorney in the Wilson v. Vickery

12  case?

13     A.  That's right.

14     Q.   And it's pending in the federal district

15  court?

16     A.  Now -- now, that -- the Gates v. Collier is

17  in federal -- you know, it's been there for -- well,

18  he's the -- he's the representative of the affected

19  class, so he's the one that brings the suit.

20     Q.   And Wilson v. Vickery, is it filed here in

21  Jackson or --

22     A.  Yeah.

23     Q.   And what is that about? What was that case

24  about?

25     A.  City of Jackson and Hinds County.

1     A.  I really can't answer yes to that, but I

2  think that would have been discussed; and that would

3  have been one of the options in discussing the staffing

4  in the beginning.

5     Q.   Well, who makes the final decision about how

6  many people you're going to staff in pod control and

7  how many you're going to have in the unit -- the jail

8  -- the living area, each living area?

9     A.  Who's going to find -- who winds up with the

10  responsibility of that? I do.

11     Q.   What role does the board of supervisors play?

12     A.  Money.

13     Q.   They can determine your budget.

14     A.  They sure can.

15     Q.   Did you ask them for more money and they turn

16  you down?

17     A.  No. I've always taken what they've given me

18  and just marched right along with it. Now, you know

19  that, Mr. Turnage. You know I did. That's been the

20  problem with us from the beginning.

21     Q.   That you asked for more, but they never gave

22  it to you.

23     A.  No.

24     Q.   Well, for housing state inmates, the county

25  gets paid, I mean, $20 a day or $25 a day?

1    A.   Well, you know, still -- if that be the case,
2   they don't start paying until they pick you up on their
3   books if you're convicted and being held there, which
4   means it can be as much as a month before you get the
5   first nickel.
6        The second part of that is when it costs you
7   $35 a day to run the jail, it's not really good
8   business to house them for 20, is it?
9    Q.   But that's what the rate is?
10   A.   Um-hum. (Affirmative)
11   Q.   Yes or no?
12   A.   Twenty-nine for a -- for a work center.
13   Q.   Well, did the board at some point reduce your
14  staffing level?
15   A.   Again, I have to -- I'm going to have to let
16  the board speak for themselves, and I have -- you know,
17  I can speak to -- as to what I do as sheriff and how I
18  staff according to the moneys that I have.
19   Q.   What do you understand on June the 13th and
20  the 14th was the minimum level of staff that you needed
21  in accordance to the guidelines from the --
22   A.   Again, I'm not prepared to answer that now.
23   Q.   Okay.
24   A.   You had me all excited for a minute. I
25  thought you were packing up to go, and now you're just

1   grabbing a yellow sheet.
2    Q.   If I wanted to know the inmate census figures
3   on June 13th through the 14th of 2007, where would that
4   information be kept?
5    A.   We have a copy of the A, B, C list, which is
6   an alphabetical list of every -- every inmate or
7   detainee in the Hinds County system.
8    Q.   So on June the 13th and the 14th of 2007, if
9   I wanted --
10   A.   Tell you every one of them from A to Z, where
11  they are.
12   Q.   And who -- who would be the person that would
13  push the computer to do that?
14   A.   Just call -- well, Counselor can put you in
15  touch with that.
16   Q.   Well, I'm asking you which department. Who's
17  over the department?
18   A.   Well, Major Rushing.
19   Q.   Okay. And she's the facility commander.
20   A.   That's correct.
21   Q.   So she should know everything about the
22  facility.
23   A.   Well, I hope.
24   Q.   That's what you hired her for.
25   A.   That's what I hired her for.

1    Q.   Were there some studies that you mentioned
2   that was done by the National -- the NIC? What is --
3   the National Institute of Corrections?
4    A.   That's correct.
5    Q.   But did they come up with some
6   recommendations for the jail on staffing?
7    A.   If my memory serves me correctly, yeah.
8    Q.   Where are those documents?
9    A.   They'll be at the jail.
10   Q.   Major Rushing would know where they are?
11   A.   (Nods affirmatively)
12   Q.   How long has Major Rushing been working for
13  you?
14   A.   Ten years.
15   Q.   And it was within the last ten years when
16  these recommendations were made by NIC?
17   A.   Well, when she would be in charge of the
18  records. You don't just throw them away.
19   Q.   Sir?
20   A.   I say we don't just throw them away. I mean,
21  they would be kept on file there. She's in charge of
22  the records and bookkeeping.
23   Q.   Okay. And how long did you say Mr. Barlow
24  had worked as a booking officer? How long had he been
25  there?

1    A.   I think he's close to retirement.
2    Q.   And the other person's name -- you don't know
3   who it was, but if I wanted to find out, Major Rushing
4   should know that too?
5    A.   Should.
6    Q.   She should know?
7    A.   Should.
8        MR. TURNAGE:   Okay. All right. I think
9   that's all the questions that I have for the
10  sheriff today.
11       MR. HESTER:   I do have a few follow-ups.
12       EXAMINATION
13  BY MR. HESTER:
14   Q.   Sheriff, you were asked several questions
15  about policies and procedures today. Do you recall
16  generally being asked about that?
17   A.   I did.
18   Q.   I want to ask you about a few documents, if I
19  can, and have these marked as exhibits.
20       I'm going to hand you, first, a document
21  consisting of three pages and ask if you can tell us
22  what that is, please.
23   A.   It's "Health Services Policy and Procedures
24  Manual. Communication on Special Needs Patients."
25  It's on Page No. 38.

1    Q.  Is that one of the policies and procedures of
2  the Hinds County Sheriff's Department?
3    A.  It is.
4    Q.  What is the purpose of that policy?
5    A.  "To communicate on special needs patients.
6  Ensure special needs of inmates with significant
7  medical, psychiatric, or development disabilities are
8  taken into account and consideration and decisions
9  concerning housing, program, and work assignments,
10  disciplinary measure and admissions to and transfers
11  from the institution."
12    Q.  I'm not going to ask you to read everything
13  on the document.
14    A.  Okay.
15    Q.  But looking at that document with you, it
16  says that there are procedures and so forth set forth
17  below it?
18    A.  Right.
19    Q.  Why do you have procedures?  What's the
20  purpose of the procedures?
21    A.  To make sure that those people have medical
22  and psychiatric recommendations for housing, program
23  and work participation made by healthcare staff and
24  communicated in writing to correctional station.
25    Q.  And is the procedure, generally speaking, in

1  terms of a policy and procedure is in order to
2  implement the policy?
3    A.  It is.
4    Q.  And do you recognize that document as a true
5  and correct copy of your policy as identified?
6    A.  I do.
7        MR. HESTER:  Let me have that marked as
8    the next exhibit, please.
9        (EXHIBIT 2 MARKED)
10        MR. TURNAGE:  Can we agree that this
11    document here Bates stamped 1 is --
12        MR. HESTER:  You can dictate it into the
13    record.
14        MR. TURNAGE:  Is HC-112.
15        MR. HESTER:  You can dictate it.  I don't
16    want you writing on my document, but you can dang
17    well dictate into the record anything you want to
18    about the numbers, but don't write on my
19    document.  Okay?
20        MR. TURNAGE:  Well, what harm is it going
21    to have to put the Bates stamp number on there?
22        MR. HESTER:  You're disfiguring my
23    document.  You've got the Bates number on your
24    document.  You didn't offer it and you had a
25    chance to do so.  I'm putting them in the way I

1    want to put them in.
2  BY MR. HESTER:
3    Q.  Next question, Sheriff:  Another set of
4  documents.  In fact, they are three in number.
5  Actually, two.  Can you tell us what that document is,
6  please.
7    A.  Health Services Policy and Procedures Manual,
8  and this one is -- title is "Procedure in the event of
9  an inmate death."
10    Q.  Okay.  What's the purpose of that policy?
11    A.  "To ensure accurate, timely reporting and
12  investigation of any inmate death that occurs within
13  the institution."
14    Q.  Okay.  And can you tell us whether or not
15  there -- you don't have to read them, but are there
16  procedures set forth in that document?
17    A.  There are.
18    Q.  And is it a true and correct copy of that
19  policy and procedure document as maintained by the
20  Hinds County Sheriff's Department?
21    A.  It is.
22        MR. HESTER:  I move that into evidence as
23    Exhibit 3, please.
24        (EXHIBIT 3 MARKED)
25

1  BY MR. HESTER:
2    Q.  Sheriff, you were asked earlier today about
3  whether or not you provide training for your officers.
4  Correct?
5    A.  Correct.
6    Q.  I hand you an additional document and ask you
7  if you can identify that, please.
8    A.  Under personnel and training, title "Training
9  for Correctional Officers."
10    Q.  Is that a policy of the Hinds County
11  Sheriff's Department dealing with training for
12  correctional officers?
13    A.  It is.
14    Q.  And what is the purpose of that?
15    A.  It's to "ensure correctional staff is made
16  aware of potential emergencies, appropriate responses,
17  and to life-threatening situations and their
18  responsibility for early detection of illness and
19  injury."
20    Q.  And is that a true and correct copy of that
21  particular policy?
22    A.  It is.
23    Q.  And that's one of the Hinds County Sheriff's
24  Department's documents.  Correct?
25    A.  Correct.

1     MR. HESTER: I move that as Exhibit 4,
2  please.
3         (EXHIBIT 4 MARKED)
4  BY MR. HESTER:
5     Q.  Sheriff, generally speaking, tell us what the
6  purpose is for having training of your personnel.
7     A.  Well, I mean, training is important so that
8  officers can ensure their safety, the safety of those
9  that are under their care and responsibility so that
10  they'll know what to do in a particular situation that
11  they might come up with in the course of the line of
12  duty.
13     Q.  Okay.  And tell us -- and explain, if you
14  will, how the provision of training relates to what you
15  were asked about earlier in terms of your
16  responsibility to supervise those who work underneath
17  you.
18     A.  It's my job and my responsibility, my duty,
19  to see that these people are trained to do the jobs
20  that they have been -- that they have assumed, been
21  appointed to, and the responsibility has been delegated
22  to in order for them to perform.
23     Q.  Okay.  And in very general terms, could you
24  tell us what measures you have taken to ensure that the
25  training is provided, for example, for the jail

1  personnel who work at the Hinds County Detention Center
2  in Raymond.
3     A.  We have the, of course, mandatory state
4  requirement for training of detention officers that we
5  conduct in-house, have training officers; and then
6  officers who have been experienced in the field come in
7  and conduct various classes and CPR, first aid, and
8  other things that they'll need in the line of duty.
9     Q.  All right.  And the jail personnel, the jail
10  correctional officers, if you will, that work at the
11  Hinds County Detention Center in Raymond, can you tell
12  us whether or not they are trained in accordance with
13  the curriculum and protocols provided by the state of
14  Mississippi?
15     A.  That's -- they are, and our -- our academy,
16  our training, is recognized by the state, and we train
17  officers from other jails throughout the state.
18     Q.  Okay.  But the officers who actually work in
19  the Raymond detention center in Hinds County are
20  trained according to the state curriculum?
21     A.  That's correct.
22     Q.  And you were asked about whether or not
23  there's anybody who actually provides training.  Is
24  there a full-time training officer?
25     A.  There is.  Rick Van Egmond is full-time

1  training officer.
2     Q.  Does he coordinate the training for the Hinds
3  County Detention Center?
4     A.  He coordinates the training for the detention
5  center and schedules outside training as well.
6     Q.  And, again, before we get on to other
7  policies, you were asked about several things regarding
8  the chain of command at the sheriff's department.  Why
9  do you have a chain of command at the sheriff's
10  department?
11     A.  Everybody needs to know who they are
12  responsible to, what their duties and responsibilities
13  are, who they report to, and why.
14     Q.  Okay.  Moving back a little more closely to
15  the specifics of this case, you were asked about
16  whether or not you knew what psychotropic medications
17  were.
18     A.  Correct.
19     Q.  You're not a medical doctor, are you?
20     A.  I'm not.
21     Q.  And not being a medical doctor, have you ever
22  adopted a policy and procedure for the Raymond
23  detention center relative to or dealing with
24  psychotropic medications?
25     A.  I have.

1     Q.  And I'm placing a document in front of you.
2  Do you recognize what that is?
3     A.  That's under, again, Health Services Policy
4  and Procedures Manual, and the title is "Psychotropic
5  Medication."
6     Q.  What's the purpose of that document?
7     A.  "To outline procedures ensuring inmates
8  requiring psychotropic medications are evaluated and
9  monitored by psychiatrists in a timely manner, mental
10  health and nursing staff provides support to
11  psychiatrists to ensure adequate monitoring of inmates
12  prescribed psychotropic medication."
13     Q.  And is that a true and correct copy of your
14  Hinds County Sheriff's Department policy and procedure
15  regarding policy -- excuse me -- regarding the
16  psychotropic medication and the monitoring thereof?
17     A.  It is.
18     Q.  Those are two separate policies, are they
19  not?
20     A.  They are.
21     Q.  Okay.  What's the purpose of the second one,
22  which is the Monitoring of Psychotropic Medication?
23     A.  "To outline procedures ensuring psychiatrist
24  receives timely notifications of noncompliance and
25  other medication-related problems when an inmate is

1 prescribed psychotropic medication."
2    Q.   Is that a true and correct copy of your
3 policy?
4    A.  It is.
5        MR. HESTER: I'm going to ask that the
6    monitoring -- excuse me -- that the psychotropic
7    medication policy document be marked as the next
8    exhibit, No. 5.
9        (EXHIBIT 5 MARKED)
10        MR. HESTER:  And I'll ask that the policy
11    regarding monitoring of psychotropic medications
12    be marked as Exhibit 6.
13        (EXHIBIT 6 MARKED)
14 BY MR. HESTER:
15    Q.   Sheriff, you've also been asked by opposing
16 counsel about things that went on or go on in the
17 booking process for inmates, inclusive of Mr. Leggett.
18 Do you recall being asked about that?
19    A.  I'm not sure about the question.
20    Q.   Well, earlier, opposing Counsel asked you
21 about how people are booked in and what goes on.
22    A.  Right.
23    Q.   Okay.  Do you have a policy on how to receive
24 and screen inmates?
25    A.  I do.

1    Q.   I'm going to hand you a document.  Can you
2 tell us what that is, please.
3    A.  It's under "Inmate Care and Treatment."
4 Title is receiving -- Receiving Screening."
5    Q.   And what is the purpose of that policy?
6    A.  "To ensure newly arrived inmates are screened
7 to provide continuity of care and to identify inmates
8 who pose a threat to their own or others' safety,
9 health, and may require immediate intervention."
10    Q.   All right.  And in that particular policy,
11 you've got four categories I would like you to read
12 into the record, if you will.
13    A.  Okay.
14    Q.   Under your policy.
15    A.  All right. "Receiving screening will be the
16 responsibility of the healthcare and/or health-trained
17 correctional staff. Inmates will be screened for
18 suicidal tendencies, chronic medical problems,
19 unresolved acute medical problems, and communicable
20 diseases, including any past history of or symptoms
21 suggestive of tuberculosis. Any inmate who is
22 unconscious, semiconscious, bleeding, or otherwise
23 obviously in need of immediate medical attention will
24 be referred to the emergency room for all care."
25    Q.   The next one, No. 4.

1    A.  "Findings of the screening will be recorded
2 on a screening form provided by the medical director.
3 The receiving screening includes inquiry into current
4 illness, health problems, veneral diseases, infectious
5 diseases, problems known to be specific to women,
6 including last menstrual period, and status or diseases
7 specific to particular ethnic groups."
8    Q.   And there are several other things that are
9 on the document.  I won't require you to read it
10 because it will speak for itself, but do you recognize
11 this document which consists of, I believe, six pages
12 as being a true and correct copy of the Hinds County
13 Sheriff's Department policy on receiving and screening
14 of inmates?
15    A.  I do.
16        MR. HESTER:  Okay. I'll have that marked,
17    please, as Exhibit No. 7.
18        (EXHIBIT 7 MARKED)
19 BY MR. HESTER:
20    Q.   Sheriff, in the case of Mr. Leggett, I know
21 you were not personally involved with him, but I do
22 want to ask you about, as follow-up to that last policy
23 document, is whether or not there was in fact a health
24 screening form completed for Mr. Leggett dated June 11,
25 2007.  And I'll hand you a document.

1    A.  It's a Hinds County Sheriff's Office intake
2 booking health screening form on Jeffery Jerome
3 Leggett.
4    Q.   Is that form completed?
5    A.  It is com- -- it has been completed, signed.
6    Q.   And I know we don't know the signature of
7 Mr. Leggett, but --
8    A.  No.
9    Q.   -- it at least purports to bear the name or
10 signature of Jeffery Leggett.  Is that correct?
11    A.  That's correct.
12    Q.   All right.  And that document's dated what
13 date?
14    A.  6/11/07.
15    Q.   At what time?
16    A.  2:02.
17    Q.   That would be 2:02 in the morning?
18    A.  That's correct.
19    Q.   Do you recognize that as a business record of
20 the Hinds County Sheriff's Department?
21    A.  Yes, sir.
22        MR. HESTER:  I move for the admission of
23    that document as Exhibit No. 8, please.
24        (EXHIBIT 8 MARKED)
25

BY MR. HESTER:

1
2    Q.   And I hand you another document again as a
3    follow-up to the prior policy document that I showed
4    you.  Do you recognize that form?
5    A.   It's a Hinds County Detention Center suicide
6    prevention screening dated 6/11/07 at 2:01.
7    Q.   And who's the inmate listed on that document?
8    A.   Jeffery Jerome Leggett.
9    Q.   Okay.  And Question No. 1 on that document,
10   the question was asked -- and I'll read it, and I'll
11   let you tell us what the answer was -- "Did
12   arresting/transporting officer state that he/she
13   believes the inmate may be a suicide risk?"
14            What was the answer?
15   A.   The response was "No."
16   Q.   And moving down that particular page to Item
17   No. 5, line 5, it says, "Inmate past previous suicide
18   attempt," question mark?  "Note method."
19            And what was the answer:  Yes or no?
20   A.   "No."
21   Q.   Okay.  In fact, the only question on that
22   particular document, which contains more than 13
23   questions, the only one that's marked "yes" is No. 7.
24   Is that correct?
25   A.   That's correct.

1    Q.   And what is the question in line 7?
2    A.   "Has inmate ever been arrested before?"
3    Q.   All right.  Is this a business record of the
4    Hinds County Sheriff's Department?
5    A.   It is.
6            MR. HESTER: Mark that as Exhibit 9,
7    please.
8            (EXHIBIT 9 MARKED)
9    BY MR. HESTER:
10   Q.   Sheriff, do you have a policy with the Hinds
11   County Sheriff's Department for mental health screening
12   evaluation for inmates?
13   A.   We do.
14   Q.   I'm going to hand you a document and ask if
15   you can identify that, please.
16   A.   "Health Services Policy and Procedures
17   Manual."  Title is "Mental Health Screening
18   Evaluation."
19   Q.   And what is the purpose of that particular
20   document, please?
21   A.   "To outline procedures for mental health
22   evaluation of all inmates within 14 days of arrival at
23   the jail."
24   Q.   So everyone, no matter who they are, whether
25   they need it or not, they are going to get screened.

1    Is that correct?
2    A.   Within 14 days of arrival at the jail.
3            MR. HESTER: And let's mark that, please,
4    as Exhibit 10.
5            (EXHIBIT 10 MARKED)
6    BY MR. HESTER:
7    Q.   I hand you another document.  This one, I
8    believe, may deal with a different subject matter.  Can
9    you tell us what that is, please.
10   A.   "Emergency services" under "Inmate Care and
11   Treatment."
12   Q.   And what is the purpose of that?
13   A.   "To ensure there is a written plan to provide
14   24-hour emergency medical, mental, and dental care to
15   inmates as needed."
16   Q.   And is that a policy and procedure document
17   of the Hinds County Sheriff's Department?
18   A.   It is.
19   Q.   And was that in place in 2007?
20   A.   Effective 4th month, 2003.
21   Q.   And the last time it was reviewed?
22   A.   Reviewed 4th month, 2006.
23   Q.   And do you recognize that four-page document
24   as being a true and correct copy of that policy
25   document as adopted?

1    A.   It is.
2    Q.   And how is it, as a practical matter, that
3    medical care, including care for those in need of --
4    when I say "medical," I would include either mental or
5    dental care as well -- if it's a serious medical,
6    mental, or dental need, how is that healthcare provided
7    and specifically how was it provided in 2007 at the
8    Raymond detention center?
9    A.   Um.
10   Q.   Well, in other words, did you have a medical
11   staff on call?  Did you have people on contract?
12   A.   We had medical staff on call and people on
13   contract to provide those services.
14   Q.   And what type of people in terms of
15   healthcare professionals were working at the facility
16   itself?
17   A.   We have doctors under contract.  Dr. Reddix,
18   who we spoke of earlier, I think, was there --
19   certainly there at the time.  Not at the time, but
20   during that particular time period he was on staff.
21   Q.   What about nurses?
22   A.   Central -- yeah, we have RNs, LPNs.
23   Q.   Okay.  And if an inmate cannot be adequately
24   assessed or treated or ultimately cared for by the
25   people who are either on contract or who work there on

1 a regular basis, what do you do with those inmates who
2 need further medical care?
3     A. Central Mississippi Medical Center. Yeah,
4 central Mississippi Methodist Medical Center provides
5 it.
6     Q. And is it the correctional officer or is it
7 the medical personnel who make the decision regarding
8 the need for emergent medical care?
9     A. The medical personnel.
10        MR. HESTER: This particular policy and
11     procedure document, Emergency Services, I'm going
12     to have that marked as an exhibit.
13        (EXHIBIT 11 MARKED)
14 BY MR. HESTER:
15     Q. And you were asked a number of questions
16 about mental health services being provided in 2007 at
17 the Hinds County Detention Center at Raymond.
18        Was there a specific policy dealing with
19 mental health services for the sheriff's department
20 that applied to the Raymond facility?
21     A. Under "Special Needs and Services" under our
22 Health Services Policy and Procedure Manual, Mental
23 Health Services. Purpose is to -- "mental health
24 services are available for all inmates who require
25 them."

1     Q. What was the actual policy?
2     A. "Treatment services include on -- on- or
3 off-site crisis intervention, including short-term
4 individuals and/or group therapy follow-up as needed.
5 Psychotropic medication management, medical, and
6 substance abuse services are sufficiently coordinated
7 such that the patient management is appropriately
8 integrated, health needs are met, and the impact of any
9 of these conditions on each other is adequately
10 addressed."
11     Q. And is that a true and correct copy of your
12 policy document relating to mental health services and
13 special needs and services?
14     A. It is.
15        MR. HESTER: We'll have that marked,
16     please, as Exhibit 12.
17        (EXHIBIT 12 MARKED)
18 BY MR. HESTER:
19     Q. You were asked a number of questions also by
20 opposing counsel today about whether or not the Hinds
21 County Sheriff's Department does anything to recognize
22 and prevent suicides at the Raymond detention center.
23 I'm going to hand you a document and ask if you can
24 identify that, please.
25     A. (Reviews documents) Under "Health Services

1 Policy and Procedure Manual, Special Needs and
2 Services"; title is "Suicide Prevention Program."
3     Q. And what is the purpose -- what is that? Is
4 that one of your general orders or one of your policy
5 and procedure documents?
6     A. Its purpose is to outline a program to
7 effectively address the risk of suicide within the
8 inmate population. The facility has a program that
9 identifies and responds to suicidal inmates.
10     Q. And in that particular policy document, if I
11 may look at it with you, you've outlined in your policy
12 eight different measures as part of the policy that
13 represent dealing with suicide prevention issues. Is
14 that correct?
15     A. That's correct.
16     Q. All right. And then you also have a
17 procedure section of this -- procedure section of this
18 policy document that consists of three different
19 things. Correct?
20     A. That's correct.
21     Q. And then you also have in the policy document
22 a procedure which is to be followed following a hanging
23 attempt. Correct?
24     A. Correct.
25     Q. And that consists of five different itemized

1 steps. Is that correct?
2     A. Correct.
3     Q. All right. Is this a true and correct copy
4 of your suicide prevention program policy and procedure
5 document as maintained for the Hinds County Sheriff's
6 Department and as applied to the Raymond detention
7 center for the year 2007?
8     A. It is.
9        MR. HESTER: Move for the admission of
10     that as Exhibit No. 13.
11        (EXHIBIT 13 MARKED)
12 BY MR. HESTER:
13     Q. Sheriff, why do you have a suicide prevention
14 program policy and procedure?
15     A. Because suicide in the jail is a -- is a
16 threat.
17     Q. And what is the purpose of you adopting a
18 policy and procedure to deal with that?
19     A. To eliminate that -- that threat.
20     Q. And what role does training play in
21 eliminating that threat?
22     A. Training provides people with the tools
23 necessary in order that they might deal with that
24 problem amongst inmate population.
25     Q. And is it suicide prevention and the matters

1  that you've discussed in relation to that document, is
2  that part of the training provided to the correctional
3  officers at the Raymond detention center?
4      A.  It is.
5      Q.  I hand you an additional document also
6  dealing with issue of suicide prevention, and tell me
7  what that particular document is.  Or is that a
8  duplicate?  I believe it's a duplicate.  It's a
9  different document.
10     A.  Yeah.  To -- the purpose of this suicide --
11 this is part of the suicide prevention program to
12 establish guidelines and procedures to manage suicidal
13 or potentially suicidal inmates consistent with
14 security requirements and accepted mental health
15 practices.
16     Q.  Okay.  And under that policy document -- and
17 I'm going to ask you whether or not this does, in fact,
18 represent a true and correct copy of the suicide
19 prevention document.
20     A.  Um-hum.  (Affirmative)
21     Q.  And that's your policy and procedure.  Is
22 that correct?
23     A.  Correct.
24     Q.  All right.  You have a number of just general
25 headings here, and I want to ask you, if you would,

1  what is the first aspect of that policy?  Number 1,
2  please.
3      A.  (Indicating)
4      Q.  Yes, sir.
5      A.  "Whenever an inmate demonstrates or reports a
6  risk for self-destructive behavior, immediate
7  assistance will be provided."
8      Q.  What is the second aspect of that policy,
9  please?
10     A.  "Precaution procedures will be implemented
11 until evaluated by mental health staff."
12     Q.  What is the third aspect of that policy?
13     A.  "Mental health evaluation will determine the
14 subsequent actions needed to pro -- needed to provide
15 inmate support and monitoring during the critical
16 period."
17     Q.  And the fourth aspect of that policy is what?
18     A.  "Training for institutional staff as well as
19 medical staff should include an awareness of
20 potentially suicidal inmates, and the following are
21 behaviors that they can look for in order to determine
22 that."
23     Q.  And those are listed A through K.  Is that
24 correct?
25     A.  That's correct.

1      Q.  And then there's a fifth aspect of the
2  policy.  Is that correct?
3      A.  It is.
4      Q.  What is that?
5      A.  That "evaluation by mental health staff will
6  include, but not be limited to, an assessment of
7  inmate's mental status, inmate's self-report of
8  behavior resulting in referral, current suicidal risk,
9  ideation plans, lethality of plans, recent stressors,
10 goal, or behavior, history of suicidal behavior,
11 ideations, how often, when, method used, contemplated,
12 why, consequences of prior attempts, gestures, inmate's
13 report of his or her potential suicidal behavior,
14 inmate's consent of refusal to make no harm contact.
15 I'm not going to hurt myself.  I feel better now.  If
16 I'm suicidal again, I will ask for help.  Mental health
17 staff will consult with psychiatrist or medical
18 director to assist in evaluation, if needed."
19     Q.  These are also a multiphased procedure that's
20 adopted in this particular policy document?
21     A.  Correct.
22     Q.  And there is a document that's attached as an
23 exhibit which is headed or has the title "Suicide
24 Prevention Watch Log"?
25     A.  Um-hum.  (Affirmative)

1      Q.  What is a suicide watch, and why do you have
2  such a log?
3      A.  For the officer to sign in to as he checks
4  back on the -- on the potential -- well, on the
5  detainee who is -- or he is determined to be suicidal
6  in order that he might be checked to see if he
7  regularly checks on that inmate or detainee.
8      Q.  And under your policy, Sheriff, under your
9  procedure to implement the policy we've been talking
10 about, I'd like to refer you under the procedures
11 section of that policy, and I'd like you to tell us
12 that -- under part 2, if you will, I'd like you to read
13 part 2-A first and tell us whether or not that is part
14 of your procedure to implement this policy.
15     A.  All right.
16     Q.  At the bottom.
17     A.  "Inmate will be placed in an area designated
18 by security to permit close observation.  If constant
19 observation cannot be maintained, inmate will be placed
20 in an area with other inmates but having restricted
21 access to instruments of self-harm."
22     Q.  Is that part of your prescribed or ordered
23 procedure to implement the suicide prevention program?
24     A.  It is.
25     Q.  All right.  And referring you under that same

1  procedure to Item E, would you read that for the
2  record, please.
3      A.  "Inmate will be observed at least every 15
4  minutes by direct contact with correctional staff."
5      Q.  Okay.  And is that part of the procedure that
6  was required by your policy?
7      A.  It was.
8      Q.  For suicide prevention?
9      A.  Correct.
10     Q.  And was this in effect at the time
11 Mr. Leggett was housed at the Hinds County Detention
12 Center at Raymond?
13     A.  Correct.
14         MR. HESTER:  Can I have this marked.
15         (EXHIBIT 14 MARKED)
16 BY MR. HESTER:
17     Q.  Sheriff, even in the context of all of these
18 policies and procedures that have been adopted, how do
19 your correctional officers learn of these policies and
20 procedures that they are required to follow and to
21 implement?
22     A.  Through training.
23     Q.  And is that conducted through your
24 correctional officers at the Raymond detention center?
25     A.  That's correct.

1      Q.  And was that done in 2007?
2      A.  It was.
3      Q.  An inmate who is housed at the Raymond
4  detention center, specifically in the month of June,
5  and specifically on June 14th of 2007, such as
6  Mr. Leggett, that inmate would or would not have the
7  right to refuse medical or mental health care?
8      A.  He would.
9      Q.  I'm going to hand you a document and ask if
10 you recognize that form of the document.
11     A.  Yeah, I do.
12     Q.  And what does that appear to be?
13     A.  This is a refusal for medical and dental
14 treatment.
15     Q.  Okay.  What's the date on that document?
16     A.  6/14/07.
17     Q.  And whose signature -- whose inmate signature
18 is purported to be on that document?
19     A.  Jeffery Leggett.
20     Q.  And what is his inmate pin number, please?
21     A.  68204.
22     Q.  And on that particular date, does that
23 indicate whether or not Mr. Jeffery Leggett on June
24 14th, 2007, refused medical care and treatment?
25     A.  It says here he refused sick call.

1      Q.  Okay.  And you've been told today and asked
2  by opposing counsel to assume that Mr. Leggett
3  committed suicide on June 14, 2007.  Is that correct?
4      A.  6/14/07 date.
5      Q.  And, in fact, I'm going -- do you recognize
6  this medical refusal document as being a true and
7  correct copy of a business record for the Hinds County
8  Sheriff's Department?
9      A.  I do.
10         MR. HESTER:  Have that marked as Exhibit
11     15, please.
12         (EXHIBIT 15 MARKED)
13 BY MR. HESTER:
14     Q.  And I'm going to hand you an excerpt from --
15 I know you're not a doctor, but I'm going to hand you
16 an excerpt from Mr. Leggett's medical records.  It has
17 three entries on it; one for June 13th when he was seen
18 by medical.  Is that correct?
19     A.  Right.
20     Q.  Those are, in fact, physician's orders, are
21 they not?
22     A.  Right.
23     Q.  And he was also attempted to be seen on June
24 14th, 2007, at 6:23 in the morning.  Correct?
25     A.  Right.

1      Q.  And that is the point at which it appears to
2  indicate that the inmate refused sick call.  Correct?
3      A.  Says "Inmate refused sick call" --
4      Q.  If you can't read it, that's fine.
5      A.  I can't -- that's --
6      Q.  That's fine.
7      A.  -- a little small for my eyes.
8      Q.  And, again, on the same day, June 14, 2007,
9  at 2100 hours, that was when the inmate was found
10 hanging in his cell.  Correct?
11     A.  That's correct.
12     Q.  In B Pod?
13     A.  Correct.
14     Q.  And is it the regular custom and practice of
15 the Hinds County Sheriff's Department to maintain and
16 keep progress notes and physician's orders for inmates
17 at the Hinds County Detention Center?
18     A.  It is.
19         MR. HESTER:  I'll have that marked as
20     Exhibit 16, please.
21         (EXHIBIT 16 MARKED)
22 BY MR. HESTER:
23     Q.  Sheriff, with regard to Jeffery Leggett, the
24 decedent who committed suicide in the Raymond detention
25 center on June 14, 2007, did you have any personal

1  involvement whatsoever with Mr. Leggett prior to the
2  time of his death?
3      A.  None.
4      Q.   Did Mr. Leggett make any requests of you
5  personally or have any contact with you personally --
6      A.  He did not.
7      Q.   -- to request any aspect of medical care or
8  to request assistance of you of any type?
9      A.  He did not.
10     Q.   And, again, as of the time of Mr. Leggett's
11 death on June 14, 2007, had anyone with the Raymond
12 detention center notified you personally as Malcolm
13 McMillin or as sheriff that Mr. Leggett was in need of
14 any type of assistance, be it medical care or
15 otherwise?
16     A.  He did not.  They did not.
17     Q.   All right.  Sheriff, you were asked about
18 several statutes with regard to Mississippi law and
19 your duty, as opposing counsel put it, to care for
20 inmates.  I want to ask you this question:  Do you
21 believe as sheriff of Hinds County, Mississippi, and in
22 2007, specifically, did you fulfill your personal
23 responsibilities and duties with regard to the inmates
24 at the Raymond detention center inclusive of Jeffery
25 Leggett?

1      A.  I have.
2          MR. HESTER: I tender the witness.
3              FURTHER EXAMINATION
4  BY MR. TURNAGE:
5      Q.   Sheriff, with respect to this Exhibit 16, are
6  you saying that a person who has been adjudicated to be
7  mentally incompetent, in need of mental treatment,
8  could refuse?
9      A.  He can refuse medical care.
10     Q.   Does it say on here who he refused medical
11 care from?
12     A.  From the nurse that would come to the cell.
13 Refused to go to sick call.
14     Q.   Does this form, Exhibit 16, indicate who the
15 nurse was?
16     A.  I didn't see it there, no.
17     Q.   And this form, Exhibit 15, are you saying
18 that this form here -- it's got in there -- it says, "I
19 understand and -- I understand that possibility, and I
20 hereby waive my right to medical treatment and hold the
21 Hinds County sheriff, his officers and employees,
22 blameless in my refusal to obtain recommended treatment
23 results in further complication."
24         I mean, you're saying that a patient that has
25 been adjudicated as mentally incompetent or in need of

1  mental treatment by the Hinds County Chancery Court,
2  that he can --
3      A.  That's the form and that's his signature.
4      Q.   And that you said this is a valid form to
5  excuse you and your officers from not providing him
6  treatment and protecting him?
7      A.  That's his right to refuse medical treatment.
8      Q.   But I thought the judge ordered that he get
9  medical treatment.
10         MR. HESTER:  Object to the form of the
11 question.
12     A.  I can't answer that.
13 BY MR. TURNAGE:
14     Q.   But you read the order.  Right?
15     A.  I read the order.
16     Q.   What did the order say?
17     A.  It said ordered for him to receive medical
18 treatment.
19     Q.   Did your staff provide him any medical
20 treatment according to your documents?
21     A.  He refused medical treatment.
22     Q.   Did you tell the judge that?
23     A.  Well, no.
24     Q.   Okay.  All right.
25         MR. TURNAGE:  All right.  I've got nothing

1  further.
2          MR. HESTER:  I have a follow-up to your
3  question.
4          MR. TURNAGE:  I object to it because --
5  I'm objecting to it as improper recross or
6  whatever you want to call it.  It's not -- I'm
7  objecting to it.  It's improper.
8          MR. HESTER:  You can object all you
9  like -- that's fine -- and you made it for the
10 record, and it's either admissible or it's not.
11             FURTHER EXAMINATION
12 BY MR. HESTER:
13     Q.   You were asked about what the judge ordered.
14 I didn't ask you about that; Mr. Turnage did.
15         I'm going to show you a document that's
16 called Order of Commitment.  You've been asked about
17 that several times today.  Correct?
18     A.  I have.
19     Q.   Okay.  And the specific portion of the order
20 as you were requested to read is that the inmate was --
21 in this case, Mr. Leggett, the respondent -- was
22 committed for what or committed to?
23     A.  "He was committed to Mississippi State
24 Hospital for observation, diagnosis, and treatment."
25     Q.   Okay.

1    A.  "Hinds County Jail for holding until bed
2  becomes available at the Mississippi State Hospital,
3  there being no less restrictive appropriate facility
4  for holding for his protection and for the protection
5  of others."
6        MR. HESTER:  I move for the admission of
7     that document as Exhibit 17.
8        (EXHIBIT 17 MARKED)
9        FURTHER EXAMINATION
10  BY MR. TURNAGE:
11    Q.  In light of that Exhibit 17, you're familiar
12  with 19-5-43.  Right?
13    A.  (Reviews documents)
14    Q.  Right?
15    A.  If you'll let me read it, I'll tell --
16    Q.  Okay.
17    A.  -- you whether I'm familiar with it or not.
18    Q.  All right.
19    A.  (Reviews documents) I don't see anything
20  about treatment here.  I see all reasonable and proper
21  allowance for the care and maintenance to be paid out
22  of the county treasury.  Doesn't authorize me to treat
23  him.  I can't treat him.
24    Q.  Temporary care for indigent person with
25  mental illness.

1  the reason he didn't get it is because he refused.
2    A.  I can't make him.
3        MR. TURNAGE:  Okay.  All right.  Thank
4     you.
5        MR. HESTER:  No further questions.  Thank
6     you.
7        We will read and sign if you'll send that to
8     me.
9        (DEPOSITION CONCLUDED AT 5:37 P.M.)
10        * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    A.  Not -- not medical care.
2    Q.  Okay.
3    A.  Not medical care.
4    Q.  So you're saying that the judge put -- that
5  this order means that he wasn't to get any treatment
6  until he got to Whitfield?
7    A.  I didn't say that.
8    Q.  Okay.
9    A.  What I said is what my order was -- to keep
10  him until the bed was open.
11        And Whitfield was ordered for his care and
12  treatment -- I mean for his treatment, for his
13  diagnosis and treatment, not me.  I mean, they can't
14  get -- they can't order me to do it.  I don't have the
15  -- you know, I'm not.
16    Q.  Okay.  So you treat all the mental patients
17  that come through your jail -- you don't give them any
18  temporary, I mean, care until they get to Whitfield?
19    A.  Now, you know that's not what I said, and you
20  know that I've got a psychiatrist that's on -- that's
21  on contract, and you know I provide that.
22    Q.  But you agree in this case Jeffery Leggett
23  didn't get any psychiatric --
24    A.  He didn't get any.
25    Q.  -- or psychotropic medication, and you say

1        CERTIFICATE OF COURT REPORTER
2        I, SHAUNA W. STANFORD, Certified
3  Shorthand Reporter and Notary Public in and for
4  the State of Mississippi at large, hereby certify
5  that the foregoing pages contain a full, true, and
6  correct transcript of the proceedings as taken by
7  me at the time and place heretofore stated in the
8  aforementioned matter and later reduced to
9  typewritten form by me to the best of my skill and
10  ability.
11        I further certify that I placed the
12  witness under oath to truthfully answer all
13  questions in this matter under the authority
14  vested in me by the State of Mississippi.
15        I further certify that I am not in the
16  employ of or related to any counsel or party in
17  this matter and have no interest, monetary or
18  otherwise, as to the final outcome of this
19  proceeding.
20        WITNESS MY SIGNATURE AND SEAL, this the
21  13th day of September, 2010.
22        _____
              SHAUNA W. STANFORD, CSR
23              CSR NO. 1380
24  My Commission Expires:
25  April 12, 2012

```
 1              CERTIFICATE OF DEPONENT
 2          I, MALCOLM McMILLIN, deponent in the
 3    deposition taken in the herein styled and numbered
 4    cause, certify that I have examined the foregoing
 5    pages, being the total number of pages relating to
 6    my testimony, as to the correctness thereof, and
 7    that after reading said pages, and subject to any
 8    corrections I may have attached hereto as a
 9    Deponent's Corrections Sheet, I find them to
10    contain a full, true, and correct transcript of
11    the testimony as given by me.
12          This the _____ day of _____,
13    2010.
14          _____
                        MALCOLM McMILLIN
15
16    STATE OF MISSISSIPPI
17    COUNTY OF _____
18          SUBSCRIBED AND SWORN TO BEFORE ME, the
19    undersigned authority, on this the _____ day of
20    _____, 2010.
21          _____
                        NOTARY PUBLIC
22
23    My Commission Expires:
24
25
```

```
 1          DEPONENT'S CORRECTION SHEET
 2
 3    PAGE    LINE        CORRECTION
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14
15          _____
                        MALCOLM McMILLIN
16
17    STATE OF MISSISSIPPI
18    COUNTY OF _____
19          SWORN AND SUBSCRIBED TO BEFORE ME, this
20    the _____ day of _____, 2010.
21
22          _____
                        NOTARY PUBLIC
23
24    My Commission Expires:
25
```